UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,          :
          Plaintiff,               :
                                   :
          v.                       :
                                   : Criminal Action No. 07-0065 (GK)
CHRISTIAN FERNANDO BORDA,           :
et al.,                            :        **FILED**
          Defendants.              :
                                   :        APR 2 7 2011

Clerk, U.S. District and
Bankruptcy Courts

### MEMORANDUM OPINION

Defendants Christian Fernando Borda and Alvaro Alvaran-Velez
bring this Motion for New Trial, pursuant to Federal Rule of
Criminal Procedure 33. On December 9, 2010, Defendants were
convicted under the Controlled Substances Import and Export Act, 21
U.S.C. §§ 951 et seq., of conspiracy to distribute five kilograms
or more of cocaine with the intent or knowledge that the cocaine
would be unlawfully imported into the United States. See Verdict
Form as to Christian Fernando Borda [Dkt. No. 207]; Verdict Form as
to Alvaro Alvaran-Velez [Dkt. No. 209]; 21 U.S.C. §§ 959, 960, 963.
Under Federal Rule of Criminal Procedure 29, Defendants first moved
for judgment of acquittal, which this Court denied in a Memorandum
Opinion on March 9, 2011 (Mem. Op.) [Dkt No. 238].

On January 15, 2011, Defendants filed a Joint Motion for New
Trial, (Defs.' Mot.)[Dkt. No. 227], under Federal Rule of Criminal
Procedure 33, arguing that a new trial is warranted in the interest

of justice as the Jury's verdict is against the weight of the evidence and resulted from numerous errors.

Upon consideration of the Motion, the Opposition, the Reply, the entire record herein, and the applicable case law, Defendants' Joint Motion for New Trial is **denied.**[1]

## I. Background

Defendants were each convicted of conspiring, beginning in January 2005 and continuing at least to October 2005, to distribute five or more kilograms of cocaine with the intent or knowledge that the cocaine would be unlawfully imported into the United States. See 21 U.S.C. §§ 959, 963. At trial, Defendants did not dispute that they had distributed cocaine during that period, but argued that they neither knew nor intended that the cocaine would be unlawfully imported into the United States.

The Government offered evidence of three separate drug deals in 2005. The first deal, "Palm Oil One," took place between January and May 2005. In Palm Oil One, Defendants Borda and Alvaran arranged to ship 1,553 kilograms of cocaine concealed in drums of palm oil from Cartagena, Colombia to Puerto Progreso, Mexico. Upon

---

[1] In their submissions on the Motion for New Trial, parties incorporate by reference the arguments contained in their briefing on the Motion for Judgment of Acquittal. Defs.' Mot. 1; Government's Opposition to Defendants' Second Corrected Motion for New Trial 1 (Feb. 14, 2011) ("Gov't Opp'n") [Dkt. No. 231]. As these arguments were addressed in the Court's March 9, 2011 Memorandum Opinion, the Court does not reconsider them here to the extent that they are not expressly raised by the parties.

the shipment's arrival in Puerto Progreso, an associate named Raul Valladeres, or "Junior," contacted Defendants to say that he could transport the cocaine to Monterrey, Mexico and would pay Borda $9,100 per kilogram within ten days after receipt of the drugs. Tr. at 18:24-20:18, 25:10-28:15 A.M. Session, Nov. 4, 2010. Defendants agreed to Junior's proposal, and Junior transported the cocaine north to Monterrey. Id.; Gov't Ex. 40b at 3-4.

The Government introduced evidence that Monterrey is located less than two hours away from the United States border. The Government's evidence also showed that Monterrey is an inland city in Mexico with insufficient demand for a load of cocaine as large as the Palm Oil One load. See Gov't Ex. 40b at 6 (Defendant Alvaran stated that Monterrey is "not a market for personal use").

In addition, the Government introduced the following evidence to prove that Defendants were aware that Junior was trying to sell the cocaine across the Mexican border into the United States.

First, on June 15, 2005, Defendant Alvaran met with the Government's confidential informant, Camilo Suarez, after Junior had failed to pay Defendants for Palm Oil One within ten days of his receipt of the drugs. Suarez testified at trial that, in the course of that meeting, Alvaran expressed his understanding that the cocaine had been moved north of Mexico City to Monterrey. Tr. at 22:2-9 P.M. Session, Nov. 15, 2010; Gov't Ex. 34b.

Second, on July 20, 2005, Borda met with Alvaran and Suarez to discuss Junior's progress in making payments for Palm Oil One. Suarez defended Junior's delay to Borda by explaining that the "market went bad because the border got, [] harder for him." Gov't Ex. 40b at 3-7. Defendants then discussed the conditions at the border in further detail. Id. At one point, Borda noted that he understood Junior's difficulties because he had once been a drug dealer in the United States. Id. at 10. Borda also went on to explain that his source for cocaine in Colombia had told him how such transactions usually proceed:

> [Mexicans] get the merchandise, they say they'll take it, they pay us nine thousand in Monterrey and they go and sell it on the other side[2] for, for fourteen thousand or fifteen thousand pesos, and we're the ones that are losing because we lose time, money and everything else.

Id. at 22-23.

Third, Suarez testified at trial that "[a]ll 1,553 [kilograms] went to the United States." Tr. at 44:5-9 A.M. Session, Nov. 18, 2010. Suarez also testified that he did not recall any discussion that Borda's 724 kilogram share of the Palm Oil One cocaine was going to Europe. Tr. at 46:13-17 P.M. Session, Nov. 18, 2010.[3]

---

[2] "On the other side" refers to the United States.

[3] In their Motion for Judgment of Acquittal, Defendants argued that this testimony was contradicted by Suarez's subsequent testimony on November 22, 2010 that he did not know what Junior had done with the cocaine. In its March 9, 2011 Memorandum Opinion, the (continued...)

Finally, both Suarez and Borda's secretary in Mexico City, Juan Montoya, testified at trial that payment was received from Junior for Palm Oil One in United States currency. Tr. at 45:17-24 A.M. Session, Nov. 17, 2010; Tr. at 71:9-18 A.M. Session, Nov. 24, 2010.

In the second deal, "Palm Oil Two," Defendants discussed shipping additional cocaine from Colombia to Mexico, but ultimately never did so because of their difficulties in receiving payment for Palm Oil One. Finally, the third deal, named the "Chino Load," was

---

$^3$(...continued)
Court rejected this characterization:

> [T]his argument takes Suarez's testimony out of context. On November 22, 2010, Suarez testified that he lacked any knowledge on November 22, 2005--the date of the recording about which he was being questioned--as to what Junior had done with the drugs. Tr. at 31:5-34:15 A.M. Session Nov. 22, 2010. There is no contradiction between this statement and his testimony at trial regarding his current knowledge about the final destination of the cocaine.

Id. at 4 n.2.

In their Reply brief, Defendants challenge this conclusion. Defendants' Reply to Government's Opposition to Their Motion for Judgment of Acquittal and For a New Trial 11-12 (Mar. 14, 2011) ("Defs.' Reply") [Dkt No. 241]. Defendants assert that evidence introduced at trial and contained in an April 2006 email, at which point "the Palm Oil [One] deal was completed [and] no more monies were paid," shows that "there is no basis for believing that Suarez learned any additional information after that date that could be imputed to the defendants" about the final destination of the cocaine shipment. Id. at 11. However, as with the November 2005 statement, there is no contradiction between the April 2006 statement and Suarez's testimony at trial "regarding his current knowledge about the final destination of the cocaine." Mem. Op. 4 n.2.

-5-

scheduled for September 2005. In this third deal, Borda, Alvaran, and an associate named "El Chino" agreed to transport a second load of 3,000 kilograms of cocaine from Colombia to Mexico City, Mexico in two "go-fast boats," one of which was a Venezuelan-registered fishing vessel. However, the crew of that fishing vessel, which was carrying half of the Chino Load, threw the cocaine into the Caribbean Sea shortly before being intercepted by the United States Coast Guard. Tr. at 41:24-42:17 A.M. Session, Nov. 16, 2010. Consequently, the United States Coast Guard found no cocaine on the ship.

On the basis of this evidence, the Jury returned a verdict of guilty against Defendant Borda and Defendant Alvaran, concluding that each conspired to distribute more than five kilograms with the knowledge or intent that the cocaine would be unlawfully imported into the United States.

## II. Standard of Review

Under Federal Rule of Criminal Procedure 33(a), "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." In deciding a motion for new trial, the court has broad discretion. United States v. Lam Kwong-Wah, 924 F.2d 298, 308 (D.C. Cir. 1991); United States v. Reese, 561 F.2d 894, 902 (D.C. Cir. 1977).

Motions for new trial are "not favored and are viewed with great caution." United States v. Blackthorne, 378 F.3d 449, 452

-6-

(5th Cir. 2004) (citations omitted). Contrary to the Government's burden at trial to prove guilt beyond a reasonable doubt, Defendants bear the burden of proof under Rule 33 to demonstrate that a new trial is warranted. United States v. Mangieri, 694 F.2d 1270, 1285 (D.C. Cir. 1982); Reese, 561 F.2d at 902.

Despite the court's broad authority to order a new trial, it should be "exercised sparingly" and "limited to situations presenting a serious danger that a miscarriage of justice has occurred – that is, that an innocent person has been convicted." United States v. Wilkerson, 656 F. Supp. 2d 22, 28 (D.D.C. 2009)(internal quotations and citations omitted). A new trial may be granted "only in the extraordinary circumstances where the evidence preponderates heavily against the verdict," United States v. Rogers, 918 F.2d 207, 213 (D.C. Cir. 1990)(internal quotations and citations omitted).

Unless an error, defect, irregularity, or variance affects a defendant's substantial rights, it shall be disregarded. United States v. Lawson, 494 F.3d 1046, 1053 (D.C. Cir. 2007). In cases where such rights are adversely affected, the error must have a "substantial and injurious effect or influence in determining the . . . verdict" in order to warrant a new trial. United States v. Dominguez Benitez, 542 U.S. 74, 81, 124 S. Ct. 2333 (2004)(alteration in original)(internal quotations and citation omitted). The Government "'bears the burden of proving the absence

of such an effect.'" United States v. Smith, No. 09-3119, 2011 WL 1437378, at *6 (D.C. Cir. Apr. 15, 2011) (quoting United States v. Linares, 367 F.3d 941, 952 (D.C. Cir. 2004)).

In deciding whether a new trial should be held, the court may weigh the evidence and consider the credibility of witnesses to determine whether a serious miscarriage of justice has occurred. Tibbs v. Florida, 457 U.S. 31, 38 n.11, 102 S. Ct. 2211 (1982); Rogers, 918 F.2d at 213. As noted by the Supreme Court in Tibbs, the court in making this determination essentially sits as a "thirteenth juror." 457 U.S. at 42; Brodie v. United States, 295 F.2d 157, 160 (D.C. Cir. 1982) (internal quotations and citation omitted); Wilkerson, 656 F. Supp. 2d at 28 (internal quotations and citation omitted).

## III. Analysis

Defendants raise the following five claims to support their motion for a new trial: (1) the evidence offered by the Government is insufficient to sustain the Jury's verdict that Defendants had the necessary intent, as required by statute, for conviction of conspiracy to distribute cocaine with the intent or knowledge that it would be unlawfully imported into the United States; (2) the Government's closing remarks improperly argued facts not in the record and invited the Jury to speculate that Defendants knew or intended to import cocaine into the United States; (3) the Court violated Defendants' Sixth Amendment confrontation and due process

-8-

rights by excluding key evidence; (4) the Court's Final Jury Instructions were flawed; and (5) the Court erred in precluding Defendant Alvaran's closing argument regarding lack of evidence that the Palm Oil One cocaine shipment had been imported into the United States.

## A. Evidence of Intent

A conviction under 21 U.S.C. § 959 requires proof of intent or actual knowledge; it is not enough to merely show that a defendant should have known that the illegal substance would be unlawfully imported into the United states. United States v. Chan Chun-Yin, 958 F.2d 440, 443 (D.C. Cir. 1992). However, "proof [of a defendant's actual knowledge] may take the form of circumstantial as well as direct evidence." Id. (citations omitted).

Defendants argue that evidence introduced by the Government fails to establish Defendants' "specific intent" to import cocaine into the United States. Defs.' Mot. 3. In this regard, Defendants claim that the Government's case is based "primarily on a single statement by Suarez that . . . [Junior] . . . sent 200 kilos [of the Palm Oil One shipment] to New York." Id. Defendants attack the credibility of Suarez's testimony, arguing that it is not corroborated by any other material evidence or testimony and is, in fact, contradicted by statements Suarez made in November 2005 and April 2006 claiming that neither he nor anyone else knew what Junior had done with the Palm Oil One shipment. Id. at 3-9.

Defendants also argue that, at most, Suarez's statements demonstrate that the only actual knowledge the Defendants had was that the Palm Oil One shipment was moved from Puerto Progreso to Monterrey, Mexico. Id. at 6-9.

In making these claims, Defendants largely repeat arguments presented in their Motion for Judgment of Acquittal. For reasons similar to those contained in the Court's March 9, 2011 Memorandum Opinion denying that Motion, Defendants' arguments fail for several reasons.

First, Defendants err in claiming that the Government's case revolves exclusively around Suarez's testimony about the Palm Oil One shipment reaching the United States. Rather, as discussed above as well as in the Court's March 9, 2011 Memorandum Opinion, the Government presented evidence to prove a number of other facts supporting conviction. Mem. Op. 7-8. For example, the Government offered evidence showing that Junior informed Defendants of his intention to bring the Palm Oil One shipment, including Borda's share, north from Puerto Progreso to Monterrey shortly after it was delivered from Colombia. Further evidence, which was undisputed, also established that Monterrey has no market for personal consumption of cocaine, and is less than two hours from the United States border. There was also evidence demonstrating that Junior's delay in paying Borda and Alvaran for the Palm Oil One shipment led

-10-

to a series of discussions in which Junior's difficulties in moving the cocaine across the border were explained to Defendants.

Second, as clearly reflected in the statute, 21 U.S.C. § 959 requires that Defendants have the knowledge or intent that the drugs "will be unlawfully imported into the United States" (emphasis added). Having failed to address this issue in their Motion for Judgment of Acquittal, Defendants now raise it in the pending Motion for New Trial.[4] However, their arguments do not address the appropriate mens rea inquiry, namely, whether Defendants intended or knew that the Palm Oil One shipment would enter the United States. See Mem. Op. 9 ("Defendants keep misstating what the statute requires. They say repeatedly that there was no evidence that they knew that the cocaine was imported into the United States. . . . The difference is between proving that past importation occurred, as opposed to proving knowledge or intent of future importation into the United States.")(emphasis in original)(citation omitted).

Instead, much of Defendants' challenge focuses on what Suarez did not know or what he should have known about the actual, final destination of the Palm Oil One shipment. See Defs.' Mot. 5 ("In a recorded conversation dated November 22, 2005, that directly

---

[4] In response to the Court's March 9, 2011 Memorandum Opinion, Defendants' Reply attempts to recast their claims so as to address whether evidence demonstrates that Defendants had the knowledge or intent that the cocaine would be imported into the United States. Defs.' Reply 8 n.2.

-11-

contradicts his trial testimony, Suarez is heard explaining to Montoya that he (Suarez) did not know what Junior had done with the cocaine from the Palm Oil Deal."); Id. at 6 ("Suarez, who had been Junior's associate for more than 10 years and had introduced Junior to Borda would have known in November 2005 whether Junior had shipped the cocaine to New York."). While these claims may raise doubts as to how much Suarez actually knew about the cocaine's shipment to New York, Defendants do not thereby meet their burden of proof for purposes of their Motion for New Trial, to show that "the evidence preponderates heavily" against a finding that they had the knowledge or intent that the Palm Oil One shipment would be imported into the United States. Rogers, 918 F.2d at 213 (internal quotations and citation omitted).

Similarly, Defendants' emphasis on the fact that their only actual knowledge was of the transfer of the Palm Oil One shipment to Monterrey also misses the point. See Defs.' Mot. 6 (arguing that in a July 20, 2005 recorded conversation with Defendants, Suarez assured them that Junior "had not sent the merchandise to the United States"); Defs.' Reply 7 ("There is no evidence that Junior told either defendant that he was taking the cocaine to Monterrey to import it to the United States or that the defendants would otherwise know that."); Id. at 9 (arguing that Borda's statements in a July 22, 2005 recorded conversation do not demonstrate that he knew Junior was trying to transport the Palm Oil One shipment into

-12-

the United States). However, the Defendants' admission of their actual knowledge that the cocaine had been transported to Monterrey, is not inconsistent with a finding that they also intended or knew that the shipment would ultimately be imported into the United States.

In their Motion papers, Defendants essentially argue for a new trial on the grounds that a new, and different, jury will draw particular inferences and reach certain conclusions favorable to Defendants, which the Jury in this trial rejected. However, in weighing the evidence presented to it in this case, it was well within the bounds of the Jury's instructions to make the inferences and reach the conclusions that it did. Consequently, the Court **denies** the Defendants' challenge to their conviction on these grounds.[5]

---

[5] A number of Defendants' challenges to Suarez's in-court testimony, as well as to recorded conversations between Suarez and the Defendants, go to the sufficiency, rather than the weight of this evidence. Defs.' Mot. 2-4; Defs.' Reply 7-8, 11. However, on a Motion for New Trial, the court does not evaluate the sufficiency of the Government's evidence. See Tibbs, 457 U.S. at 42-43 ("A reversal based on the weight of the evidence, moreover, can occur only after the State both has presented sufficient evidence to support the conviction and has persuaded the jury to convict."). Consequently, these arguments cannot support Defendants' claim for a new trial. Similarly, Defendants challenge the Government's case on the Chino Load based on the sufficiency of the proffered evidence. Defs.' Reply 13. For the same reason, this claim cannot support a motion for new trial as to that issue.

## B. The Government's Closing Remarks

Defendants claim that the Government made remarks during its closing arguments which both misrepresented Suarez's statements as to the different fees Junior charged for his transportation services to Mexico and the United States, and misstated witness testimony that Borda and Alvaran received money for the Palm Oil One shipment via a "money exchange house." Defs.' Mot. 10-12. Echoing similar arguments raised in their Motion for Judgment of Acquittal, Defendants argue that the Government's misrepresentation regarding the transportation fees, as well as its use of a metaphor involving a box of bees at the border, invited speculation on the part of the Jury that the Defendants knew or intended to import cocaine into the United States. Id. at 21-22.[6]

"The touchstone of a prosecutorial misconduct claim is prejudice: the court must consider 'the probable effect the prosecutor's [statements] would have on the jury's ability to judge the evidence fairly.'" United States v. Thomas, 114 F.3d 228, 246 (D.C. Cir. 1997) (alteration in original) (quoting United States v. Young, 470 U.S. 1, 12, 105 S. Ct. 1038 (1985)). See United States v. Watson, 171 F.3d 695, 700 (D.C. Cir. 1999)(holding that the court must ask "not whether evidence was sufficient to convict notwithstanding the error, but rather whether the court can say

---

[6] The Defendants raised timely objections to these statements during trial. Tr. at 90:18, 97:2-3 A.M. Session, Dec. 7, 2010.

that the error did not affect the jury's verdict; if in grave doubt the court cannot affirm [] the conviction") (internal quotations and citations omitted). Our Court of Appeals has made clear that "[t]he federal courts generally, and this court in particular, have strictly enforced the obligation of the prosecutor to avoid making statements of fact to the jury not supported by proper evidence introduced during trial." Gaither v. United States, 413 F.2d 1061, 1079 (D.C. Cir. 1969). See United States v. Edelin, 996 F.2d 1238, 1243 (D.C. Cir. 1993).

To determine whether the Government's purportedly improper remarks prejudiced Defendants' substantial rights, the Court applies a three-part test, weighing "the closeness of the case, the centrality of the issue affected by the error, and the steps taken to mitigate the effects of the error." Watson, 171 F.3d at 700 (internal quotations and citations omitted). See Thomas, 114 F.3d at 246 (alternately framing the three-part test as "the severity of the misconduct, the measures adopted to cure the misconduct, and the certainty of conviction absent the improper remarks").

In evaluating the components of this three-part test, the court may consider "the jurors' common sense in assessing the effect of a prosecutor's statement." United States v. Johnson, 231 F.3d 43, 48 (D.C. Cir. 2000). The court must also recognize that a prosecutor's statements during closing argument will rarely justify a new trial. Watson, 171 F.3d at 699. See id. at 704 (Garland, J.,

dissenting) ("[A]lthough it is error for a prosecutor to mischaracterize evidence in a summation [,] [i]t is also clear . . . that an error in a prosecutor's summation will only rarely warrant reversal of a conviction.") (alterations in original) (internal quotations and citations omitted); Edelin, 996 F.2d at 1243 ("[W]e have generally been chary of reversing convictions solely on the grounds of a misstatement in a closing argument.")(internal quotations and citation omitted).

Applying the Watson test to both the transportation fees and money exchange house issues, the Court concludes that, although the Government did misstate witness testimony regarding Junior's transportation fees[7] and did inaccurately describe the money exchange house in its closing argument, these errors did not "effect . . . the jury's ability to judge the evidence fairly." Thomas, 114 F.3d at 246 (internal quotations and citation omitted).

Regarding the "closeness of the case," it is true that the Government's evidence of Defendants' guilt was not overwhelming. With respect to the "centrality of the issue affected by the error," the transportation fees charged by Junior for shipment of cocaine to Mexico and the United States were in fact important

---

[7] The Government admits that it did not accurately convey the testimony regarding the transportation fees, conceding that Suarez testified that the fees were calculated based upon a percentage of the load while the Government's closing argument described the calculation as based upon a percentage of the price. Gov't Opp'n 26.

issues. However, perhaps because of its centrality, a great deal of evidence about the transportation fees was presented at trial, including witness testimony, charts, other documentary evidence, and vigorous cross-examination. Consequently, the Jury had a very substantial opportunity to judge the accuracy of the evidence offered, about which there was little if any conflict.[8] See United States v. Cabrera, 734 F. Supp. 2d 66, 88 (D.D.C. 2010) ("'When taken in context of the entire trial and the lengthy closing arguments and rebuttal, the objectionable references did not significantly detract from the proper focus of the argument.'") (quoting United States v. Oberle, 136 F.3d 1414, 1422 (10th Cir. 1998)).[9]

---

[8] The Court observed that the Jury in this case took its role very seriously, was extremely attentive, and many Jurors took copious notes.

[9] In his dissent in Watson, Judge Garland noted that prosecutorial misstatements are mitigated, in part, where the objectionable statements relate to evidence presented to and heard by the jury during trial:

Both the Supreme Court and [the D.C. Circuit Court of Appeals] have repeatedly held such [jury] instructions sufficient to mitigate prejudice caused by prosecutors' misstatements in closing arguments. Moreover, it bears emphasizing that this is not a case in which the prosecutor asserted knowledge of evidence neither seen nor heard by the jury, nor subject to cross-examination by the defense. In such a case, it might be argued that an instruction that the jury's recollection controls is of questionable value since the jury has no recollection on which to rely. Here, by contrast, the dispute was solely about evidence the jury did hear, and as long as the jury followed the court's instructions the (continued...)

-17-

The identity of the money exchange house, by contrast, was a minor issue that was not central to the Government's case or critical to establishing the mens rea necessary to establish Defendants' guilt. Again, the Jury heard all the testimony on this issue directly and was well-positioned to recognize that the Government's description of the money exchange house, as an "armored car company," conflated the type of car used to transport the money from Monterrey (an armored car) with the place where the money was exchanged (a money exchange house).

Finally, on "the steps taken to mitigate the effects of the error," the Court gave the Jury a number of instructions that would ameliorate the possibly harmful effects of these misstatements.

For instance, the Court instructed the Jury that closing argument did not constitute evidence to be considered in deciding Defendants' guilt. Tr. at 41:1-4 A.M. Session, Dec. 6, 2010 ("The opening statements and the closing arguments of the lawyers are not evidence. They are only intended to assist you in understanding and to persuade you about what the evidence shows."). The Court also informed the Jury that "[s]ometimes a lawyer's question suggests that something is a fact. You may consider the witness's answer, but not the lawyer's question. A lawyer's question is not evidence.

---

⁹(...continued)
prosecutor's error would be mitigated.

171 F.3d at 706 (citing Richardson v. March, 481 U.S. 200, 211, 107 S. Ct. 1702 (1987)).

A witness's answer is, of course, evidence." Id. at 41:5-8. Most significantly, the Court also instructed the Jury that in considering all the evidence in determining whether the Government had established Defendants' guilt beyond a reasonable doubt, it was "very important" that the Jury "consider and weigh the testimony of all of the witnesses who have appeared before [the Jury]." Id. at 44:16-21. Of particular importance, the Court emphasized to the Jury that "[i]f any reference by [the Court] or the attorneys to evidence does not coincide with your recollection of the evidence, it is your recollection which should control during your deliberations." Id. at 38:22-25.

As case law from our Court of Appeals has established, these jury instructions were sufficient to mitigate any prejudice to Defendants' substantial rights caused by the Government's misstatements. See Watson, 171 F.3d at 706 (holding that prejudice caused by prosecutorial misconduct during closing argument was mitigated by lower court's instructions, which directed jury that lawyers' arguments were not evidence, that witness' answers constituted evidence, but lawyers' questions did not, and that jury's recollection of previous evidence, rather than lawyers' descriptions of such, was controlling). See also Smith, 2011 WL 1437378, at *8 ("We normally presume that a jury will follow an instruction to disregard inadmissible evidence inadvertently presented to it, unless there is an overwhelming probability that

-19-

the jury will be unable to follow the court's instructions and a strong likelihood that the effect of the evidence would be devastating to the defendant.")(internal quotations and citation omitted); Johnson, 231 F.3d at 48 (holding that prosecutorial misconduct during closing argument did not prejudice defendant, in part, because judge issued general instructions ordering jury "to convict based only on the evidence and remind[ing] the jury that the lawyers' arguments were not evidence").

It certainly should not be assumed that the Jurors would disregard the Court's instructions, the witness' testimony, and all the other evidence offered during trial about the economics of shipping cocaine because of the Government's misrepresentations during closing argument. Consequently, although the Government's closing statements did misstate witness testimony, application of the Watson criteria demonstrates that these errors did not prejudice Defendants' substantial rights. The Court, therefore, **denies** Defendants' claims for a new trial on the basis of prosecutorial misconduct.[10]

## C. Sixth Amendment Claim

Raising factual allegations similar to those included in their Motion for Judgment of Acquittal, Defendants claim that the Court

---

[10] The Government's use of the "box of bees" metaphor cannot have prejudiced Defendants' substantial rights, as this argument was barely comprehensible, and certainly neither effective nor persuasive.

-20-

violated their Sixth Amendment confrontation right by failing to properly instruct the Jury to strike testimony related to Government Exhibit 77b,[11] which included several clips from an intercepted conversation between Defendant Borda and others on August 22, 2006. Defs.' Mot. 15-20. Defendants also argue that the Court violated their Sixth Amendment right to confrontation and due process by excluding two pieces of evidence: (1) a recording and transcript of an August 2006 conversation between Suarez, Defendants, and one of Junior's associates regarding drugs Junior sent to Europe on Borda's behalf ("Borda Exhibit 42"); and (2) a March 6, 2006 email from Junior [Dkt. No. 227-2], in which he tells his contacts at the U.S. Drug Enforcement Agency (DEA) that Borda is not interested in sending cocaine to the United States. Id. at 12.[12]

Under the Sixth Amendment, a defendant's basic due process rights involve "an opportunity to be heard in [her] defense . . . . the right to present [her] version of the facts as well as the prosecution's to the jury so it may decide where the truth lies."

---

[11] Defendants also challenge the Court's decision to strike Government Exhibit 35 a/b, without "inform[ing] the Jury that the testimony related to the intercepted conversation was also struck." Defs.' Mot. 20 n.1. For the same reasons, discussed below, that Defendants' arguments regarding Government Exhibit 77b fail, this Court also denies Defendants' challenge to the Court's handling of Government Exhibit 35 a/b.

[12] It appears that this email never received an Exhibit number at trial.

<u>Washington v. Texas</u>, 388 U.S. 14, 18-19, 87 S. Ct. 1920 (1967) (internal quotations and citation omitted). Nonetheless, the district court has "considerable discretion to place reasonable limits on a criminal defendant's presentation of evidence . . . ." <u>United States v. Whitmore</u>, 359 F.3d 609, 616 (D.C. Cir. 2004)(citation omitted). In exercising its discretion, the court should, however, "be cautious [] particularly where a party is seeking to impeach a witness whose credibility could have an important influence on the outcome of the trial." <u>Id.</u> (internal quotations and citation omitted).

In reviewing claims for constitutional error, the court applies a harmless error standard. <u>Chapman v. California</u>, 386 U.S. 18, 23-24, 87 S. Ct. 824 (1967), <u>overruled on other grounds by Brecht v. Abrahamson</u>, 507 U.S. 619, 113 S. Ct. 1710 (1993); <u>Smith</u>, 2011 WL 1437378, at *5. Under this standard, which differs from the standard of review for non-constitutional error, once a defendant has established that a constitutional error has occurred, the burden shifts to "the Government [] [to] show 'beyond a reasonable doubt that the error at issue did not have an effect on the verdict, not merely whether, absent the error, a reasonable jury could nevertheless have reached a guilty verdict.'" <u>United States v. Cunningham</u>, 145 F.3d 1385, 1394 (D.C. Cir. 1998)(quoting <u>Chapman</u>, 386 U.S. at 24). <u>See</u> <u>Dominguez Benitez</u>, 542 U.S. at 81 n. 11 (citing to <u>Chapman</u> in noting that "[w]hen the Government has the

burden of addressing prejudice, as in excusing preserved error as harmless on direct review of [a] criminal conviction, it is not enough to negate an effect on the outcome of the case"); Delaware v. Van Arsdall, 475 U.S. 673, 681, 160 S. Ct. 1431 (1986) ("[A]n otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt.") (citation omitted). With regard to violations of the Sixth Amendment's Confrontation Clause, "the focus of the prejudice inquiry in determining whether the confrontation right has been violated must be on the particular witness, not on the outcome of the entire trial." Van Arsdall, 475 U.S. at 680.

As will be demonstrated below, the Court did not commit constitutional error in excluding Defendants' exhibits or in giving its jury instruction on Government Exhibit 77b.

In its December 2, 2010 Memorandum Opinion, ("Dec. 2010 Mem. Op.") [Dkt. No. 196], the Court excluded Borda Exhibit 42 and Government Exhibit 77b, among other exhibits. The Court's Opinion centered primarily upon discussion of Government Exhibit 77b, which the Court excluded because "[t]he meeting at which these statements were made was held on August 22, 2006, a substantial period of time beyond the time during which the main part of the conspiracy existed. It makes no sense that Suarez would be talking to Borda,

Alvaran . . . in August of 2006 when palm oil #1 was successfully completed in March of 2006 . . . ." Dec. 2010 Mem. Op. 2.

With regard to Government Exhibit 77b, although Defendants concede that the Court did instruct the Jury to strike the related testimony, Defs.' Mot. 19, they argue that the prejudicial nature of the Exhibit as well as the two-week delay in the Court's decision to strike the evidence required that the Court tell the Jury exactly what portions of the testimony should be disregarded. Id. at 15-19. After striking the Exhibit, the Court instructed the Jury that "Ladies and Gentlemen, I'm sure you all understand. The actual testimony in court regarding those particular exhibits and clips, that testimony is struck from the record as well." Tr. at 7:10-13 P.M. Session, Dec. 6, 2010.

Defendants do not point to any case law establishing a Sixth Amendment violation where a court, as in this case, excludes the offending evidence and instructs the jury to strike related testimony, but stops short of specifying the exact testimony to be excluded. While Defendants also argue that the Exhibit itself was prejudicial, Defs.' Mot. 19-20, this Court's remedy was, in fact, precisely tailored to cure that prejudice, by both excluding the offending Exhibit and instructing the Jury to strike all related testimony. See United States v. Morrison, 449 U.S. 361, 364 101 S. Ct. 665 (1981)("Cases involving Sixth Amendment deprivations are subject to the general rule that remedies should be tailored to the

-24-

injury suffered from the constitutional violation and should not unnecessarily infringe on competing interests."). Defendants do not demonstrate how this Court's "nearly two week" delay in rendering its instruction would alter this conclusion.

With regard to Borda Exhibit 42, the same logic for excluding Government Exhibit 77b applies to the Court's exclusion of Borda's evidence. Both Borda Exhibit 42 and Government Exhibit 77b refer to different portions of the same conversation that took place in August 2006, several months after the end of the Palm Oil One conspiracy. Consequently, as with Government Exhibit 77b, Borda Exhibit 42 could not reasonably be understood as relevant to the charged crime.

Defendants cannot convincingly claim that their right to confront Suarez about this conversation was violated,[13] as the Sixth Amendment does not afford Defendants the right to cross-examine the Government's witness on matters that cannot reasonably be connected with the conspiracy at issue. See Van Arsdall, 475 U.S. at 680("[A] criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination . . . .")(emphasis added); Delaware v. Fensterer, 474 U.S. 15, 20, 106 S. Ct. 292 (1985)("[T]he Confrontation Clause guarantees an opportunity for effective cross-

---

[13] It should be noted that Suarez spent many hours on the stand being cross-examined by both defense counsel at great length. The Jury had ample opportunity to assess his credibility.

examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.") (emphasis in original) (citation omitted). Finally, even if exclusion was error, it is beyond a reasonable doubt that it could not have affected the Jury's verdict because it did not relate to the Palm Oil One deal.

As to the March 2006 email, Defendants again fail to meet their burden of showing that the Court's exclusion of this evidence amounts to constitutional error. In their Motion, Defendants do not contest that the email constitutes inadmissible hearsay within hearsay under Federal Rule of Evidence 801(d)(2), United States v. Yildiz, 355 F.3d 80, 82 (2d Cir. 2004).

According to Defendants, the email contains representations by Junior that Borda "is not interested in sending anything to the United States[,] Nothing. He is interested in Spain, (Valencia) and Mex[ico]." Defs.' Mot. 13-14. In fact, the email, does not contain any reference to Borda by name, although it does specifically mention other individuals. Assuming, however, that Defendants are correct and the email does relate to Borda, Borda conceded in his trial motion to admit the same email that this discussion related to "apparently illicit business ventures that are obviously not part of the charged conspiracy." Defendant's Motion to Admit Evidence and Motion in Limine to Preclude Irrelevant Evidence and Argument 1 (Dec. 2. 2010) [Dkt. No. 193]. Evidence of Borda's purported lack of interest in sending other shipments of cocaine to

-26-

the United States, which are "obviously not part of the charged conspiracy," certainly does not compel the conclusion that he did not have the knowledge or intent that Junior, rather than he, Borda, would send cocaine from the Palm Oil One shipment to the United States. Consequently, there was no error in excluding this evidence nor was Defendants' Sixth Amendment right to introduce exculpatory evidence violated by the exclusion of this inadmissible email.[14] The Court, therefore, **denies** Defendants' Sixth Amendment claims.

## D. Jury Instructions

Defendants timely objected during trial to this Court's final instructions to the Jury on the elements of the offense and mens rea requirements of the charged crime, and again raise this challenge in their Motion for a New Trial. See Objections, Corrections and Additions to the Proposed Jury Instructions (Dec.

---

[14] The Government also argued that the email would "confuse issues and mislead the jury," that it related to a transaction which was not a part of the charged conspiracy, and that it did not specify whose statement it was. Government's Motion in Opposition to Defendant's Oral Motion Seeking Ruling on Admissibility of E-Mail Evidence 2-3 (Dec. 2, 2010) [Dkt No. 194]. Given the length of this trial, the fact that three different cocaine shipments were discussed at length, and the difficulty in following translated transcripts while listening to the Spanish language tape recorded phone calls and in-person conversations, the Government's concern was fully justified. Allowing in this email -- which was inadmissible hearsay -- would have opened the door to extensive testimony about Junior's cooperation with the DEA, his disappearance, and speculation about whether he was murdered because of his cooperation. Finally, the email related to a transaction which was not a part of the charged conspiracy and did not even specify whose statement it was.

-27-

5, 2010) [Dkt. No. 200]. Specifically, Defendants raise two challenges to these instructions: (1) "the final jury instructions watered down the intent necessary and allowed the jury to speculate and convict the defendants without sufficient evidence;" and (2) "[t]he final jury instructions were also flawed with respect to the quantity determination, which the jury was asked to determine after it found the defendants guilty and with respect to the instructions that it could find them responsible for a quantity which was simply foreseeable to them." Defs.' Mot. 20-21.

Because Defendants properly raised their challenge to the jury instructions during trial, the Court reviews this claim for harmless error. FED. R. CRIM P. 52(a). In reviewing jury instructions for legal error, the court considers "not just the challenged phrases, but the instruction as a whole." United States v. Washington, 106 F.3d 983, 996-97 (D.C. Cir. 1997) (internal quotations and citation omitted). An erroneous jury instruction is harmless and will not be grounds for a new trial where "in light of all the circumstances - the language of the instructions, the arguments of counsel, and the evidence itself - it is highly improbable that the jury convicted on an improper theory . . . ." United States v. Rhone, 864 F.2d 832, 835 (D.C. Cir. 1989)(internal quotations and citation omitted).

-28-

In giving its jury instruction on the <u>mens rea</u> requirements and elements of the offense for the conspiracy charge, this Court stated:

> [Defendants] are both charged with conspiracy to distribute five kilograms or more of cocaine intending and knowing that the cocaine would be unlawfully imported into the United States.
> . . . .
>
> Intending means to do a thing personally in order to bring about a desired result, not mistakenly, not accidentally, not inadvertently.
> . . . .
>
> Specifically, for you to find either Mr. Borda or Mr. Alvaran-Velez guilty of conspiracy, the government must prove each of the following elements beyond a reasonable doubt.
>
> First, that . . . an agreement existed between at least two people to commit the crime charged, namely, a conspiracy with the following objective: To distribute five kilograms or more of cocaine knowing or intending that the cocaine would be imported into the United States.
>
> Second, that the defendant knowingly and willfully joined and participated in the conspiracy, that it [sic] consciously, voluntarily, on purpose, not mistakenly, accidentally or inadvertently.
>
> In other words, ladies and gentlemen, the second element requires as to Mr. Borda, that the government must prove that he knowingly joined the charged conspiracy, and as to Mr. Alvaran, the government must prove that he knowingly joined the charged conspiracy.
>
> Third that the defendants intended or knew that such cocaine was to be unlawfully imported into the United States. . . .
>
> What the government must prove is that one or both of the defendants knew that the cocaine would be imported into the United States, or intended that the cocaine would be imported into the United States.

Tr. at 55:2-5,21-23, 56:15-25, 57:1-12,18-21 A.M. Session, Dec. 6, 2010.

Defendants are correct that a conspiracy to commit 21 U.S.C. § 959 is a specific intent crime. See United States v. Morgan, 385 F.3d 196, 206 (2d Cir. 2004)(in case involving a conspiracy under the Controlled Substances Import and Export Act, 21 U.S.C. § 963, court held that conspiracy is "specific intent crime"). See also United States v. Childress, 58 F.3d 693, 707 (D.C. Cir. 1995) (holding that conspiracy under the Controlled Substances Act requires showing of specific intent).[15]

In Childress, our Court of Appeals held that a district court's jury instruction describing a conspiracy charge under the Controlled Substances Act as a general intent crime was harmless error because the jury instructions gave "adequate guidance on the intent required." Id. at 707-709. In this case, Defendants do not even allege that the jury instruction given characterized the conspiracy as a "general intent" crime. Moreover, this Court's jury instruction clearly told the Jury, as in Childress, that conspiracy involved a "purposeful state of mind," with the result that the

---

[15] Several provisions of the Controlled Substances Act and the Controlled Substances Import and Export Act are substantially similar; their respective subsections on "attempt and conspiracy" are identical. See 21 U.S.C. § 846; 21 U.S.C. § 963. And, in fact, as the Government notes in its brief, 21 U.S.C. § 841(a)(1) of the Controlled Substances Act is the "domestic equivalent" of 21 U.S.C. § 959. Gov't Opp'n 32.

"jury could not convict under these instructions without finding what amounts to the specific intent to further the common unlawful objective." Id. at 708-09 (emphasis in original)(internal quotations and citation omitted).

If there is any error in this Court's failure to give a separate instruction on "specific intent," it is harmless error, which did not affect Defendants' substantial rights. See United States v. Brown, 739 F.2d 1136, 1143 (7th Cir. 1984) ("[T]he distinction between specific and general intent tends to confuse juries. Because of this, failure to give a separate instruction on specific intent is not reversible error so long as the court's general instructions on intent sufficiently define the appropriate mental state.") (citations omitted); United States v. Childress, 746 F. Supp. 1122, 1128-29 (D.D.C. 1990)(same), rev'd on other grounds by 58 F.3d 693.

As to the jury instruction on quantity determinations, Defendants' decidedly brief challenge does not include any authority demonstrating that the Court's instruction to the Jury on this matter was improper or erroneous. Defs.' Mot. 21. In its statements to the Jury, the Court directed, in part:

[I]f you [the jury] return a guilty verdict against one or both of the defendants on [the conspiracy charge], you must then make a determination as to the quantity of cocaine for which such defendant or defendants are responsible
. . . .
   In making any determination of drug quantities attributable to a defendant, you are instructed that a

> defendant is responsible for those drugs that he
> distributed knowing or intending that such drugs would be
> imported into the United States, and those drugs imported
> into the United States distributed by other co-
> conspirators who knew or intended such drugs to be
> imported into the United States, which the defendant
> reasonably could have foreseen would have occurred in
> furtherance of the conspiracy.

Tr. at 63:20-23, 64:3-11 A.M. Session, Dec. 6, 2010.

Since the Supreme Court's ruling in Apprendi v. New Jersey, it has been well-established that determinations of drug quantity must be reserved for the jury. 530 U.S. 466, 490, 120 S. Ct. 2348 (2000) (holding that it is for the jury to determine beyond a reasonable doubt "any fact that increases the penalty for a crime beyond the prescribed statutory maximum"). See United States v. Washington, 558 F.3d 716, 719 (7th Cir. 2009) (citing to Apprendi in holding that "drug type and quantity are sentencing factors that must be found by the jury, insofar as they establish the maximum possible sentence") (citations omitted).

In this case, the Court's instruction to the Jury directing its members to determine the amount of drugs reasonably foreseeable to Defendants was legally proper. See United States v. Hickman, 626 F.3d 756, 771 (4th Cir. 2010)(upholding judicial instruction asking the jury to decide "the type and amount of drugs reasonably foreseeable to the Defendant that would be involved in the conspiracy . . . .") (emphasis added) (internal quotations and citation omitted).

-32-

Furthermore, the Court's instruction to the Jury that it could make this determination only if it first found Defendants guilty of the underlying conspiracy charge is in accord with established practice among the circuits. See United States v. Washington, 558 F.3d at 717 (discussing, although not deciding propriety of, jury instruction on drug quantity in which jury was told to determine drug amount only if it first found defendant guilty of underlying conspiracy charge); United States v. Westry, 524 F.3d 1198, 1217 (11th Cir. 2008) (upholding jury instruction in drug conspiracy case in which jury was directed to make finding on drug amount only if it first found any of defendants guilty of conspiracy).

Because the Court, at most, committed harmless error in instructing the Jury as to the substantive offense and did not err on the instruction for the drug quantity determination, it is clear that no "substantial rights" of the Defendants were affected. Consequently, the Court **denies** Defendants' challenge to the jury instructions in its entirety.

**E. Alvaran's Closing Argument**

Defendant Alvaran argues that the Court erred in sustaining the Government's objection to Alvaran's closing statements, which attempted to focus on the Government's lack of evidence that the Palm Oil One cocaine shipment had ever actually been imported into the United States. Defs.' Mot. 22-28. Defendant Alvaran further contends that the Court's ruling on this issue led the Jury to

believe that the Court approved prosecutorial theories and disapproved those foreclosed to Alvaran's Counsel. Id. at 28-30.

The court has broad discretion in controlling the scope of closing arguments, United States v. DeLoach, 504 F.2d 185, 189 (D.C. Cir. 1974), although it should, of course, permit the prosecution and defense "a full opportunity to advance their competing interpretations [of the evidence] . . . ." Id. (citing to United States v. Sawyer, 443 F.2d 712, 713 (D.C. Cir. 1971)).

In bringing his challenge, Defendant Alvaran argues that the objectionable statements, which dealt with Junior's work as a DEA informant, would have established that the Government should have been able to, but did not, present detailed information on the Palm Oil One shipment to New York. Defs.' Mot. 26 (quoting trial transcript in which Defendants defend this line of argument by claiming that they can "show that the government didn't investigate. The logical inference is, if Junior is cooperating in August of 2005 . . . he will give information that will lead the government to . . . the cocaine . . . .").

Defendant Alvaran claims that the Court excluded the statements as disallowed missing-witness arguments. Id. at 27. That is not quite correct. Although, in sustaining the Government's objection, the Court did mention Defendants' previous request for

a missing-witness instruction,[16] Tr. at 23:21-23 A.M. Session, Dec. 7, 2010, the Court first made it very clear that its reason for precluding the argument was because it was purely speculative in nature and not based on any evidence presented at trial, id. at 20:8-9, 22:8-9, 23:6.[17]

Moreover, precluding Alvaran's closing argument on missing-witness grounds would not have prejudiced Alvaran's substantial rights. First, as noted by the Government, Defendant was permitted to present, at great length, other arguments in his closing that there was insufficient evidence establishing that the cocaine had reached the United States. Id. at 56:16-25, 57:1-4. Second, Defendant Alvaran concedes that his co-Defendant Borda was permitted by the Court "to make a nearly identical argument without objection or without any instruction to the jury by the Court . . . ." Defs.' Mot. 29. Throughout this case, Defendants have jointly

---

[16] The Court's reference was in error since Defendants are correct they had never requested such an instruction.

[17] Even if the Court had excluded Defendant Alvaran's closing argument on missing-witness grounds, Alvaran's substantial rights would not have been prejudiced by the exclusion. In Lawson, our Court of Appeals held that a lower court's failure to permit defendant's argument on missing-witness grounds was error as defendant was "simply calling into question the sufficiency of the government's evidence . . . ." 494 F.3d 1046 at 1053. However, in determining whether the defendant was thereby entitled to a new trial, the court held that it must disregard "'[a]ny error, defect, irregularity or variance which does not affect substantial rights. . . .'" Id. (alteration in original)(citing to FED. R. CRIM. P. 52(a)).

-35-

presented their defense and Alvaran has not argued that Borda's interest in bringing this particular challenge was in any way different from his own.[18] Cf. United States v. Bradshaw, 719 F.2d 907, 915 (7th Cir. 1983) (noting that "[criminal] co-defendants may, in fact, benefit from the presentation of a united defense against a common attack.")(citing Glasser v. United States, 315 U.S. 60, 92, 62 S. Ct. 457 (1942) (Frankfurter, J., concurring)).

In light of the forgoing, any error this Court may have committed in limiting Defendant Alvaran's closing argument did not affect his "substantial rights," and was mitigated by Defendant Alvaran's other closing statements on the insufficiency of evidence regarding the Palm Oil One shipment to New York as well as arguments included in Defendant Borda's closing remarks. Defendant Alvaran's claims on this issue are, therefore, **denied.**

## IV.  CONCLUSION

While the Government's evidence was not overwhelming, this Court cannot conclude that "a serious miscarriage of justice" has occurred.  Tibbs, 457 U.S. at 38 n.11.

---

[18]  Defendant Alvaran's failure to challenge Defendants' "identity" of interest is particularly noteworthy given the Government's express claim in its Opposition Brief that Defendants had "nearly identical" interests, such that any error in foreclosing Defendant Alvaran's closing argument "did not have a substantial and injurious effect or influence in determining the verdict." Gov't Opp'n 39-40.

-36-

For the reasons set forth above, Defendants' Motion for New Trial under Federal Rule of Criminal Procedure 33 is **denied** in its entirety. An Order will accompany this Memorandum Opinion.

April 27, 2011

Gladys Kessler
United States District Judge

**Copies to: Attorneys of Record via ECF**