**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES** | : | |
| | : | |
| **v.** | : | |
| | : | **Criminal No. 07-065 (GK)** |
| **CHRISTIAN BORDA,** | : | |
| **ALVARO ALVARAN,** | : | |
| | : | |
| *Defendants.* | : | |

**JOINT POST-HEARING MEMORANDUM IN SUPPORT OF**
**MOTION TO DISMISS FOR BRADY VIOLATIONS OR, IN THE**
**ALTERNATIVE FOR A NEW TRIAL**

**I.     INTRODUCTION**

An essential constitutional safeguard in the criminal justice process is the requirement, recognized in *Brady v. Maryland*, 373 U.S. 83 (1963), that the prosecution must disclose to a criminal defendant all material, favorable evidence in its possession.   To establish a *Brady* violation, the accused must prove three elements: (1) the prosecution suppressed evidence (either willfully or inadvertently), (2) that suppressed evidence was favorable to the accused, and (3) the prosecution's suppression of evidence prejudiced the accused.  *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999); *United States v. Pettiford*, 627 F.3d 1223, 1227 (D.C. Cir. 2010).  A defendant is prejudiced when there is a "reasonable probability" that the result of the proceeding would have been different if the prosecution had disclosed it. *Kyles v. Whitley*, 514 U.S. 419, 434 (1995). The accused can demonstrate such prejudice by showing that the suppressed evidence, cumulatively, "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.* at 435.

Defendants detail below multiple *Brady* violations by the Government.  These *Brady* violations were particularly prejudicial because, as the Court noted in denying the defendants' Rule 33 motion for new trial, the "Government's evidence of Defendants' guilt was not overwhelming." Order denying Defendant's Rule 33 Motion for New Trial, Doc 249 at 16, 36 (also noting the "closeness of the case").   *See, e.g., Strickland v. Washington,* 466 U.S. 668, 696 (1984) ([A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support.").  The withheld materials went to the heart of Mr. Borda's and Mr. Alvaran's defense – that they lacked the knowledge or intent that cocaine would be imported into the United States – in that they showed that the two Mexican drug traffickers involved in the Palm Oil cocaine deal had told the government that the cocaine that had been shipped to the United States was done unbeknownst to Borda and Alvaran. Each violation warrants a new trial or dismissal of the case.  This relief is undoubtedly required when these repeated and intentional *Brady* violations are combined and their cumulative effect considered.

### A.  Factual Background

The government charged defendants via indictment with one count of Conspiracy to Distribute 5 or more Kilograms of Cocaine Knowing and Intending that it Would be Imported Into the United States, in violation of 21 U.S.C. §§ 959, 960 and 963.  The government's theory at trial was that defendants trafficked large amounts of cocaine from Colombia to Mexico with the knowledge and intent that the cocaine would eventually be imported into the United States.

At trial, the government's relevant evidence consisted principally of the testimony of Camilo Suarez and Jaime Montoya.  Suarez was a government cooperator/informant who

trafficked cocaine for profit under the auspices of the DEA while he engaged defendants in a

cocaine transaction that became known as the Palm Oil load.  Montoya was a worker for Mr.

Borda in Mexico with some tangential involvement in the Palm Oil load and who began his

cooperation with the government after having been extradited to the United States.

Evidence presented at trial by the government indicated that Suarez introduced

Defendants to Raul "Junior" Valladares, whose role was to receive defendants' cocaine in

Mexico and transport it to Mexico City, but who eventually transported the cocaine to

Monterrey.  At some point during his dealings with defendants, Junior became a cooperator with

the DEA and was debriefed on his dealings with defendants.  Junior is missing and presumed

dead and was not available to testify at trial.  At trial, Suarez testified that Junior had imported

part of the Palm Oil 1 cocaine into the United States.  (Trial Tr. Nov. 18, 2010, a.m. at 44:15 –

45:3).[1]

```
15   Q.    Which part of the 1,553 kilos of the palm oil load
16         ended in New York?
17   A.    That I have knowledge of, that I am certain of, 200
18         kilos of that arrived in New York.
19   Q.    Can you tell the jury whether that was part of the 724
20         kilos that you say belonged to my client, or the remainder
21         that belonged to Junior, or perhaps the 40 that you had
22         invested, or the part that Mr. Alvaran supposedly invested,
23         or the part that that Cascarabias supposedly invested?
24         Which one of those was the 200 kilos?
25   A.    I know that Junior, with another person, transported
1          200 to New York.
2    Q.    Who?
3    A.    Junior.
```

---

[1] During pre-trial discovery, the government did not disclose any evidence to indicate that any part of the Palm Oil load had been imported into the United States.  Thus, the defense was sandbagged by Suarez' testimony because the government failed to disclose any such information prior to trial. If in fact the government was aware that Suarez' testimony was incorrect or misleading, the prosecutors had a duty to correct it.

The obvious importance of the Suarez testimony that Palm Oil cocaine had been imported into the United States was that it left the jury with a clear connection between the cocaine shipped by Defendants from Colombia and importation of that cocaine into the United States. Further, that testimony buttressed the government's arguments that recordings introduced by the government should be interpreted to mean that Defendants had the requisite intent or knowledge of importation into the United States.

To add insult to injury, the government relied on Suarez' testimony about the 200 kilogram shipment to New York in opposing Defendants' post-trial motions for new trial and judgment notwithstanding the verdict despite the fact that they withheld from the defense DEA-6 investigative reports of Junior and a recorded interrogation of HB that the cocaine imported into the United States was done unbeknownst to Borda and Alvaran. (*See, e.g.,* Government's Response to Defendants' Reply to Government's Response to Corrected Joint Supplemental Motion for Judgment of Acquittal, Doc 222 at 5-6.) ("Suarez' testimony that Junior transported some or all of the cocaine to the United States was never contradicted. The jury was entitled to conclude that Suarez had knowledge of what happened to the palm oil load, and they were entitled to believe his testimony.")

The defense theory was that even though cocaine may have been transported by defendants from Colombia to Mexico, there was no evidence that any of that cocaine was knowingly or intentionally imported by defendants into the United States. The defense decided to put forth that theory based in part on the following factors:

a.      that no evidence of importation into the United States was disclosed in pre-trial discovery;

b.      that defendants were paid the lower "Mexico rate" for the cocaine, rather than the higher "U.S. rate";

Defendants' initial *Brady* motion was based on information defendants learned from Rafael Mejia, a federal inmate who had been incarcerated with "HB," a government cooperating witness, that the government had failed to produce information that Palm Oil load[2] cocaine shipped to the United States by HB and Raul "Junior" Valladares had been done without the knowledge and consent of the defendants.  *See Brady v. Maryland*, 373 U.S. 83 (1963); (Defendant's First *Brady* motion, Doc 252).  As a result of that motion and supporting memoranda and documents filed by the parties, this Court held that Defendants had raised a colorable *Brady* claim and ordered the government to produce "copies of all DEA-6s and their rough notes relating to HB and/or Junior."  (Order, dated 10/18/11, Doc. 283).  In response, the government initially produced a large binder containing 82 separate DEA investigative reports ("DEA-6s).  With little exception, none of these reports had been previously disclosed by the government and the substance of the information contained therein had not otherwise been disclosed to the Defendants.  Upon review of those and other materials produced during the course of the *Brady* hearings, defendants uncovered additional and independent *Brady* violations and have filed two additional motions to dismiss.[3] (Defendants' Second *Brady* Motion to Dismiss, Doc 322; Third *Brady* Motion to Dismiss, Doc 325).

The sum total of the materials produced during the *Brady* hearings show an unmistakable pattern and practice by the Government of suppressing exculpatory, impeaching and

---

[2] At trial, the government alleged that defendants had shipped cocaine from Colombia to Mexico hidden inside barrels of Palm Oil.

[3] The additional materials included rough notes taken by DEA agents and audio recordings and transcripts.

discoverable information from the defendants.  In addition to Rafael Mejia's testimony, who credibly stated that HB had told him that Palm Oil cocaine sent to the United States was shipped unbeknownst to the defendants, the *Brady* materials that was withheld by the government and only produced during the post-trial *Brady* hearings include:

a.      DEA-6 of Interview with Junior, dated 1/23/06, reflecting that "*[u]nbeknownst to Borda*" Junior and HB sent 100 kilograms of cocaine to Houston (Borda H'rng Exh. 21)[4]

b.      Same DEA-6 with no mention in 11 pages of any other shipments of Palm Oil cocaine to the United States (*id*.);

c.      Recorded post-arrest interview where HB states that Palm Oil cocaine was sold in Monterrey (Borda H'ng Exh. 30 audio and transcript (recordingN-39));

d.      Recorded post-arrest interview where HB states that 100 kilos belonging to Junior and HB were the ones shipped to New York, confirming what Junior told the DEA in Borda H'rng Exh. 21 (*id*.);

e.      HB plea agreement and factual proffer in *United States v. HB*, which states that the Palm Oil cocaine sent to Houston by HB and Junior was done "*on behalf of [HB] and [Junior]* and making no reference to Defendants' Palm Oil cocaine being shipped to the United States (Borda H'rng Exh. 13);

f.      Absence of any statements regarding shipment of cocaine to the United States on behalf of Borda or Alvaran in any of the 82 DEA-6s that were produced post-trial or in any of the hundreds of DEA-6s produced pre-trial;

g.      DEA-6 of Junior interview, dated 4/5/06 referring to HB's involvement in the murder of another drug trafficker (Tab 60 at 6-7).

h.      Case Agent Michael Chase's handwritten notes of interview of cooperating witness Geraldo Cantu that took place on October 15, 2010, referring to a 2007 shipment of cocaine from Mexico to Spain (Borda H'rng Ex. 27);

i.      Agent Chase's handwritten notes relating statements by Geraldo Cantu that Junior had told him that Borda did not want to send cocaine to the United States and that Mr. Borda specifically told Cantu that Mr. Borda did not want to risk sending cocaine to the United States and specifically to New York (*id.* at 4-5); and

---

[4] Tab numbers refer to Binder of DEA Reports produced by the Gov't as directed by Court Order, Doc 296.

j.      A June 2011 letter from cooperator Luis Manjarres to government stating that Montoya, one of the government's key trial witnesses had encouraged Manjarres to lie about Borda threatening Montoya so that Montoya could obtain a benefit for himself (Borda H'rng Exh. 38).

It is patently clear from this list that the Government has been caught repeatedly making false representations to this Court and to the defense and otherwise failing to perform its duties under the Constitution, the Federal Rules and this Court's Orders.   And repeatedly, when confronted with their misrepresentations and failures, the Government has claimed that it has simply made good faith mistakes.   Additionally, the government's pretrial discovery production was a deliberate exercise in misdirection.[5]   The government dumped reams of insignificant and disorganized materials on the defense, which occupied countless hours of preparation and review time.   At the same time, the government was intentionally withholding materials that went to the heart of the case – defendant's lack of intent to import into the United States or knowledge that any cocaine would be imported or was indeed imported.

Although the government had certified[6] to the Court that "no other exculpatory evidence exists," it took the defendants' instant *Brady* motion and a Court Order explicitly directing that "the Government shall turn over to Defendants copies of all DEA-6s and their rough notes relating to HB and/or Junior" before prosecutors disclosed *Brady* materials that should have been disclosed pretrial.   (Government's *Brady* certification, filed 7/8/10, Doc. No. 79; Order, dated 10/18/11, Doc. No. 283 at 2).   Absent this Court's post-trial Order, information that is clearly favorable and material to the defense would never have seen the light of day.

---

[5] The defense repeatedly informed the Court that the government had simply dumped extensive discovery on the defendants with no index or other identifying information.  In fact, Rafael Mejia testified that the reason Mr. Alvaran approached him to help make sense of the discovery was that the government turned over discovery in "a mess."  (Tr. Jan. 24, 2012 at 108:7-15).

[6] In an Order dated June 24, 2010 (Doc. No. 77), this Court ordered the government to certify after a review of its files whether any other *Brady* material existed, and if it did exist, to produce it forthwith.

Opening statements, cross-examinations, and trial themes are not developed on the fly during trial.  If defense counsel had known *before* trial what they know now, they would have prepared a different case.  They would have aggressively cross-examined Camilo Suarez' testimony that 200 kilos of cocaine had been shipped to the United States[7] to bring out that the shipment was "unbeknownst" to Borda and Alvaran.  They would have called HB and Geraldo Cantu to testify.  They would not have shied from confronting Camilo Suarez with HB's allegations that Camilo had ordered the murder of Junior.

Moreover, defense counsel spent countless hours during trial trying to extract from the government information to which the defendants were entitled.  Sometimes the defense was successful in doing so, but other times (as we now know from the post-trial productions) it was not.  What is clear is that those countless hours should have been spent preparing the defense based on information that the government should have provided well before trial.  As Judge Bates said in *United States v. Quinn*, 537 F.Supp.2d 99, 108 (D.D.C. 2008), ""the government must disclose *Brady* information 'at such a time as to allow the defense to use the favorable material effectively in the preparation and prosecution of its case, even if this criterion requires pretrial disclosure.'" *Id.  (quoting United States v. Pollack*, 534 F.2d 964, 973 (D.C. Cir. 1973)).

In assessing the government's conduct in the instant case and the appropriate remedy, this Court should note that when faced with a similar pattern of *Brady* violations in the prosecution of

---

[7] During cross-examination, Suarez testified that 200 kilos of cocaine was sent to New York by Junior. (Trial Tr. Nov. 18, 2010, a.m. at 44 - 45).  Because the defense had not seen any discovery pertaining to this supposed shipment, the defense was sandbagged by that testimony, especially since it left the indelible impression that Defendants had something to do with it.  However, it is extremely telling that the government did not touch that subject on redirect, most likely because the government realized that the testimony left that impression and wanted to leave that impression and that questioning Suarez on that issue may reveal that the suppressed evidence.  In fact, however, the government as noted below had a much greater obligation to correct the misimpression left by its star witness.  *See Napue v. Illinois*, 360 U.S. 264 (1959) (prosecution had a duty to alert the court of false testimony by its witness); *United States v. Iverson*, 637 F.2d 799, 803 n.10 (D.C. Cir.1980) ("[T]he prosecutor had an independent responsibility to alert the Court and jury to the truth."), *modified on petition for reh'g,* 648 F.2d 737 (D.C. Cir.1981)**.**

8

Senator Stevens, the Department of Justice ultimately dismissed the charges.  *See United States v. Stevens,* Case No. 08-CR-231 (EGS) (Doc. No. 324, Gov Motion to Dismiss); *see also United States v. YeGon,* Case No 07-181 (EGS), (Doc. No. 205, Order dismissing case pursuant to Rule 48(b) after motions to dismiss based on *Brady* violations were filed).  *See also United States v. Daum*, Case No. 11-CR-102 (GK) (Doc. Nos. 152, 164, 168)[8] (finding *Brady* violation where government failed to timely produce to the defense the potentially exculpatory statements of a potential witness).  The *Stevens, Ye Gon*  and *Daum* cases are high-profile prosecutions where there is intense media interest.   In the *Stevens and Ye Gon* cases the government decided to dismiss the charges after having violated *Brady*.  The *Daum* case is pending.  The government's actions in the instant case have not garnered the same level of media scrutiny and it appears that the government will not dismiss on its own.  Nevertheless, the defendants here deserve no less than the defendants in *Stevens* and *Ye Gon*.

**B.     Government Falsely Claimed Brady Compliance**

Early in the case, counsel for Mr. Borda filed the first of several *Brady* motions when the government failed to produce to him emails that referenced Mr. Borda's explicit statements to government cooperator Raul Valladares ("Junior") that Borda did not wish to ship cocaine to the United States.  (*See Brady* Motion, Doc 52 at 5) (email from Junior to DEA agent after meeting with "Tony"[9] stating that Tony "is not interested in sending anything to the United States[,] Nothing. He is interested in Spain, (Valencia) and Mex[ico].").[10] While the government claimed that the email was not *Brady*, the Court disagreed, issuing an Order directing, among other things,

---

[8] For historical recitation of governmental *Brady* violations in local prosecutions, *see* Doc. No. 181 p. 15-17 in *United States v. Daum*, 11-CR-102.

[9] Testimony at trial disclosed that Mr. Borda was called "Tony" during the Palm Oil load deal.

[10] This email was produced to counsel for Mr. Alvaran but not to counsel for Mr. Borda.

> the Government shall file a representation to this Court that, to the
> best of its knowledge, no other material exists or that, if the
> material does exist, the Government will be producing it forthwith.

Court Order, Doc. 77 at 2.  In response to this Court's Order, the government filed a notice

stating:

> To the best of the government's knowledge, beyond the evidence
> already disclosed to the defendants, no other exculpatory evidence
> exists. Should the government discover other exculpatory evidence
> as it prepares for trial, it will produce such evidence forthwith.

(Gov't Notice Concerning Exculpatory Evidence, filed 7/8/10, Doc. No.   79).[11]  In fact,

notwithstanding that certification to this Court, the government was in possession of exculpatory

materials that it withheld from defendants until these post-trial *Brady* hearings.

### C.  The Government Suppressed *Brady* Materials that Palm Oil Cocaine was Shipped to the United States Unbeknownst to Borda and Alvaran

#### 1.  Borda H'rng Exh. 21 (DEA-6 of Debrief of Junior on 1/23/06 (Tab 36))

As we now know, the government misrepresented to the court that it had complied with

its *Brady* obligations and would continue to misrepresent because from November 2011 through

January 2012, the government finally produced DEA-6s and rough notes that clearly constitute

*Brady* materials.  For example, it was not until November 2011, one-year after the trial, that the

government produced an 11-page DEA-6 of the interview with Junior, which contained the

following statement:

---

[11] The Court granted additional defense motions for disclosure of Brady materials.  For example, on September 26, 2010, defendants sought materials regarding fact that Camila Suarez' continued to engage in narco-trafficking activities after becoming a government confidential  source and that HB had lied to the government and had implicated Suarez and himself in the disappearance/death of Junior.  *See* Doc. 110; Doc. 113 (Alvaran motion); Order partially granting request, Doc 115, filed 9/27/10.  Also, on October 27, 2010, defendants sought recording N-35 a recording of the meeting between Junior and Mr. Borda referenced in Junior's e-mail to the DEA agent.  *See* Doc 153; Order, Doc 126, 10/28/10, granting request in Doc 153.  Again, the governmernt repeatedly told the defense and this Court that recording N-35 did not exist.  When confronted with proof of its existence the government miraculously produced it that same day.

> The CS stated that Borda advanced 100 kilograms, each, to the CS and [HB].  **Unbeknownst** *to Borda*, the CS and [HB] took an additional 100 kilograms of cocaine believing they could sell it in Houston for a larger profit ($13,500/kilogram).  HB provided the 100 kilograms to Raymundo LNU to transport to Houston.  According to [HB], Raymundo never paid [HB].  Therefore, the CS was left with a $750,000.00 debt to Borda for the 100 kilograms.

DEA-6, Tab 36 at 10 (emphasis added).  Significantly, the DEA-6 makes no reference to any other shipments of the Palm Oil cocaine to the United States while referencing other shipments of cocaine to the United States made by Junior throughout his drug trafficking career, all unrelated to Borda and Alvaran. This DEA-6 meets all three prongs of a *Brady* violation – it is favorable to the defense, it was suppressed by the government, and it was material to the theory of the defense.  *See United States v. Pettiford*, 627 F.3d at 1227.

###       2.       Borda H'rng Exh. 30 (audio and transcript) (N-39 Recording of HB Post-Arrest Statement)

The government also failed to produce pretrial N-39, an audio recording of HB's post-arrest interrogation, which also contained exculpatory information.  Indeed, this recording was not produced until January 23, 2012, after the government had claimed multiple times that the recording did not exist. (*See* Defs Second Brady Motion at pp 4-5; Defendants' Joint Motion to Compel and to Show Cause Why the Government Should Not Be Held in Contempt, Doc 314, filed 1/16/12).[12]  Recording N-39 reflects that HB told a DEA-agent that the Palm Oil cocaine

---

[12]  In pertinent part, the Motion states:

> During the hearings on Defendants' *Brady* motion, Defendants' requested
> the recordings and translations/transcriptions of those recordings that pertain to HB's debriefings upon his arrest. Although the government initially claimed that such items did not exists, Defendants' pointed out references to this material in various DEA6s and the Court ordered the government to produce them to the Defendants.
>
> The government has produced N-38 and N-40, but has failed to produce

was all sold in Monterrey.  (*See* Gov't Translation, Doc. 342-1 at 8).  When prompted by the

DEA agent, HB is heard agreeing that 100 kilos that were advanced to HB and Junior were

shipped to New York.  (*Id*. at 9).  HB's version is entirely consistent with what Junior told the

DEA in his debrief on 1/23/06 (Borda H'rng Exh. 21).  As with the Junior DEA-6, this audio

recording also meets all three prongs of a *Brady* violation.

### 3.        Borda H'rng Exh. 13 (HB Plea Agreement)

The government also failed to produce the HB plea agreement from the case that was

transferred from this District to Houston pursuant to Rule 20.  The factual proffer attached to the

plea agreement was also consistent with Junior's statements in Borda H'rng Exh. 21 and HB's

statements in Borda H'rng Exh. 30 in that any cocaine from the Palm Oil load that may have

been shipped to the United States was not shipped with defendants' knowledge or intent and in

fact did not involve defendants at all. Rather, that shipment was done on "unbeknownst" to

defendants and on "behalf of" HB and Junior and clearly  belonged only to HB, Junior and their

associates.[5]  This exhibit also meets all three prongs of a *Brady* violation.

---

N-39, even though is has been requested multiple times. N-39 is the recording made of HB's debriefing during which he purportedly recants his involvement in the murder of Junior. In response to the government's anticipated insistence that N-39 does not exist, Defendants refer the government to Tab 70 of the DEA6 binder, report dated November 13, 2006, wherein it states "reference is made to [HB's] tape-recorded statement and it's resulting translation/transcription, non-drug exhibit N 39."

Doc. 314 at paragraphs 3-4.

[5]  In relevant part, HB"s Plea Agreement states that

In Monterrery, the cocaine was to be divided up with approximately 1,000 kilograms going to associates of Borda, and *the remainder being divided amongst Valladares, Jr. and the defendant and their associates*.

During April and May of 2005, Borda, with the assistance: of *Rodrigo Mora, transshipped the cocaine from Colombia to Panama* and then to the coast of Mexico.  Once the cocaine arrived in Mexico, [HB] and Valladares, Jr. arranged for the cocaine to be transported via commercial trucks to Monterrey, Mexico. In Monterrey, ***[HB], Valladares, Jr. and their associates agreed to sell*** a portion of the cocaine to another individual who stated that he was able to transport the cocaine

**D.     The Government Suppressed *Brady* Materials Regarding Information About Cocaine Shipped From Monterrey and other locations within Mexico to Europe**

At trial, defendants repeatedly attempted to examine witnesses about the traffic of cocaine from Mexico to Europe.  In fact, that defendants were engaged in such traffic was a theory of the defense.  This information also refuted the government's "bees in a box" theory that the defendants had to know that cocaine that arrived in Mexico would end up in the United States. (*See* Gov. Closing Rebuttal Argument, Trial Tr. Dec. 7, 2010 at 98).  However, at every opportunity, the government argued that there was no such market.  (*See* Gov. Closing and Rebuttal Arguments, Trial Tr. at Dec. 6, 2010 pm at 33; 49; Dec. 7, 2010 at 61-62; 65-68;70; 76-77; 80; 97).  Now, after having the benefit of the suppressed evidence, it is clear that: a) Junior told the DEA that Colombians were actively engaged in trafficking to Europe (Dea-6 dated August 30, 2005 at ¶ 6); 2) HB told the government that Bruno "secreted cocaine inside ovens and sent them to Europe" (*See* Borda H'rng Exh. 2 at ¶43). The intentional suppression of this evidence by the government deprived defendants of their right to confront witnesses and to present a defense. *See Davis v. Alaska,* 415 U.S. 308, 315 (1965).  This information also meets the three-prong test for a *Brady* violation.

**E.     The Government Suppressed *Brady* Materials Regarding Information About Borda's Desire Not To Ship to USA**

---

*to Houston*, Texas.  HB and Valladares, Jr. also agreed for this person, **on behalf of [HB] and Valladares**, *Jr.*, to transport approximately 300 kilograms of cocaine to Houston, Texas for further distribution. Subsequently, this individual never paid Valladares, Jr. and [HB] for the cocaine, and as a result they incurred a substantial debt to Borda.

Borda H'rng Exh. 13 at 14).

Under defense cross-examination at trial, Suarez repeatedly stated that on several occasions he offered Mr. Borda cocaine deals to the United States and that Mr. Borda rejected those offers.  The government argued in closing that Borda intended for the Palm Oil cocaine to go to the United States but that he simply did not want the "responsibility" of doing so.  However, Agent Chase's handwritten notes of a debrief of Gerardo Cantu on October 15, 2010, which were suppressed by the government and produced only after Agent Michael Chavarria mentioned them in passing and the Court ordered production, clearly support that defense theory.  Specifically, Cantu told the government that at a meeting with Cantu, Junior told him "I want you to meet a guy *[Mr. Borda] who doesn't want to take to the US*"; and that Mr. Borda "thought he had done the best thing by reaching Mex. & didn't want to risk sending to U.S.  *Borda was happy w/ Mex prices & didn't want to risk sending up to N.Y*. … if drugs were seized in U.S. Tony would lose most b/c he was owner."  (Borda H'rng Exh. 27) (emphasis added).

Cantu's proffer to the government is unquestionably *Brady* evidence in that it directly addresses and contradicts the government's argument that defendants knew and intended for the Palm Oil cocaine to be imported into the United States.  Further, Cantu's proffer goes to the heart of the defense that defendants knew and intended for the Palm Oil cocaine to reach Mexico only and not the United States.

Curiously, case Agent Chase' notes of the Cantu proffer shortly before trial were never reduced to a DEA-6.[13]  The government did produce pre-trial two heavily redacted DEA-6s of interviews with Cantu on November 13, 2007 and May 20, 2008, but these were not relevant to the issue at hand.  However, since the government did produce those

reports it is evident that the government considered Cantu's proffers relevant and discoverable to the defense.    The failure to produce Chase's notes can only be seen as intentional and designed to deprive defendants of their rights to a defense. These notes also meet all three prongs for a *Brady* violation.

It is noteworthy, that Special Prosecutor Henry F. Schuelke, author of the report detailing the government's failures to disclose *Brady* material in the Senator Stevens criminal case, concluded that federal prosecutors in that case engaged in **"systematic concealment of significant exculpatory evidence which would have independently corroborated [the senator's] defense."**  Among the report's findings was evidence that government agents failed to memorialize written interviews with witnesses to avoid creating evidence favorable to the defense.  (*See generally* Schuelke Report at 7).

## II.    MEJIA'S TESTIMONY IS CREDIBLE

Defendants' initial *Brady* claim arose out of Rafael Mejia's disclosing to the defense conversations he had while incarcerated with HB at Northern Neck Regional Jail.  The gist of those conversations is that HB told Mejia that although cocaine from the Palm Oil load had indeed been imported into the United States, that defendants had not intended, authorized or otherwise known about that importation.  According to Mejia, HB further claimed that he had told the government about it.  At the *Brady* hearings, the defense called HB to testify.  HB, of course, denied having told Mejia anything about defendants' knowledge of intent pertaining to the Palm Oil load's importation into the United States.

Mejia's testimony is credible.  First, he had no reason to lie as he was getting no benefits from his testimony.  Second, as the Court admonished him, his testimony exposed him to perjury

charges.  Third, Mejia had contemporaneously told his court-appointed attorney, Heather Shaner the essence of his testimony -- that persons detained with him were boasting about gaining sentence reductions by lying about Borda.  Fourth, Mejia had no way of knowing that part of the Palm Oil cocaine had been shipped to the United States unbeknownst to Borda unless he had heard it from HB.  Fifth, Mejia's testimony was corroborated by (1) the January 23, 2006 DEA-6 of Junior; (2) the factual proffer from HB's plea agreement; and (3) N-39, the post-arrest interrogation of HB.  None of these items were available to the defense until recently.

HB's denials of having told Mejia that defendants did not authorize or know about the cocaine going to the United States ring hollow for a myriad of reasons.  First, the factual proffer in his own plea clearly demonstrates that any Palm Oil cocaine shipped to the United States was requested by HB and Junior and was done on their "behalf."  (Borda H'rng Exh. 13).  Second, Junior told the DEA as much when he said that Palm Oil cocaine had been shipped to the United States "unbeknownst" to Mr. Borda.  (Borda H'rng Exh. 21).  Third, Cantu told the DEA that Junior told him that Mr. Borda did not want to risk sending the cocaine to the United States and that Mr. Borda told Cantu that he (Borda) did not want to risk sending the cocaine to the United States or New York. (Borda H'rng Exh. 27).  Fourth, Suarez' trial testimony was that it was Junior who had sent Palm Oil cocaine to New York (Trial Tr. Nov. 18, 2010, a.m. at 44:15 – 45:3).  Fifth, neither co-case agents Chase and Chavarria could specify for the Court whether any government witness told the DEA that defendants intended or otherwise knew that Palm Oil cocaine was being sent to the United States (Tr. Dec. 12, 2011 at 44:19 – 47:18 (Chase); Tr. Jan. 23, 2012 at 129:5 – 130:23 (Chavarria)).

HB's testimony is also not credible because of the manner in which his proffers with

government agents evolve to fit the government's theory of the case. For example, on November 6, 2009, HB was interviewed by the government and specifically discussed the Palm Oil load and how some of the cocaine had been brought into the United States.  In that proffer,[14] HB did not mention Borda at all with respect to the importation into the United States and his proffer is consistent with the factual proffer attached to his guilty plea. (*See* Borda H'rng Exhs. 2 at ¶ 5, and 13).  HB further discussed a meeting he had with Borda at the Hotel Presidente in Polanco and did not mention anything about Borda wanting Junior to send 50 kilos of cocaine to New York or be paid $1,000,0000.   On October 13, 2011, a month before trial, HB was again interviewed by Agent Chase and prosecutor Laymon.   This time, describing the very same meeting with Borda at the Hotel Presidente, HB mentions for the first time that Borda wanted Junior to send 50 kilograms of cocaine or pay him $1,000,000.  (*See* Borda H'rng Exh. 4 at ¶ 26).  The meeting with Borda at the Hotel Presidente was attended by Camilo Suarez, who tape recorded the meeting.  The transcript and audio tape of that meeting between Borda and HB does not support HB's version of events because there is absolutely no discussion by Borda about wanting to Junior to send 50 kilograms of cocaine to New York or to be paid $1,000,000.  (*See* Borda H'rng Exh. 15).

Moreover, HB had a reason to lie, a sentence reduction.  HB had already lied to the government when he told them that Camilo Suarez had been involved in the murder of Junior then retracted that statement.  Either the earlier or later statement was a lie.  HB has problem ordering the murder of others to gain a benefit so it is not likely that swearing an oath would deter him from lying.  *See* Tab 60 at 7 ("Tapia was killed by Carvajal on orders from HB because he failed to coordinate law enforcement protection in Manzanillo, Colima when a large amount

---

[14] In that proffer, HB was interviewed by Agent Chase and NDDS prosecutors Paul Laymon and Robert Raymond.

of cocaine belonging to HB …was seized . . .").

The same reasons HB's testimony is not credible fully support Mejia's testimony. Mejia's credibility is further supported by the fact that he contemporaneously told his lawyer, Heather Shaner, Esq., about the conversation with HB; that Attorney Shaner reported this information to NDDS attorney Carmen Colon;[15] and that at the time Mejia told Ms. Shaner about the conversation, he was seeking to cooperate with the government and had no reason to provide false information that might harm is chances at cooperation.[16]

## III.   IMPEACHMENT INFORMATION SHOULD HAVE BEEN DISCLOSED

### A.   Borda H'rng Exh. 12

At trial, Camilo Suarez was the principal government witness that testified about the specifics of the Palm Oil load.  According to Suarez, the Palm Oil load consisted of 1553 kilos of cocaine shipped from Cartagena, Colombia to Puerto Progreso, Mexico.  Suarez even produced a chart setting forth the specific figures and amounts relating to deal.  (*See* Trial Tr. Nov. 4, 2010, 15:13 - 18:23; Gov. Trial Exh. 123; Borda Trial Exh. B27 & 27A).

On December 143, 2011, the government produced to the defense Hearing Exh. 12, which H.B. testified was an accounting of the Palm Oil load that had been in the government's possession since 2009. (Tr. Dec. 13, 2011 at 25:9 - 28: 15; 27:1 – 27:6).  Hearing Exhibit 12 describes two Palm Oil loads, code named "Aracely I" for 1,189 kilos of cocaine and "Aracely II" for 1,000 kilos of cocaine.  H.B. testified that Hearing Exh. 12 consists of notations indicating

---

[15] Ms. Colon is a colleague of government trial counsel in this case.  Ms. Shaner's testimony was credible and wholly uncontradicted by the government, who could have called Ms. Colon as a witness.

[16] Ms. Shaner's uncontroverted testimony was that Mejia proffered with federal prosecutors in the Eastern District of New York, who although they could not use Mejia's information, found Mejia to be a credible witness.  (Tr. Feb. 10, 2012 at 50).

that "Tony"[17] was involved in two Palm Oil deals and specifying what drug amounts that "Tony" owned, received or delivered. (Tr. 1/24/12 at 16:20 – 19:24). H.B. further testified that his brother-in-law Reynaldo "Super" Oyervidez, an accountant for the drug trafficking organization, gave him the document now known as Hearing Exh. 12. (Tr. Dec. 13, 2011 at 27:25 – 28:6; Tr. 1/24/12 at 15:13 – 16:12).

Oyervidez testified for the government in trial of a separate matter, *United States v. Mariano Alvarez*, 07-CR-144 (SDTX). During that trial, Oyervidez testified about the exact same "Aracely" deals that H.B. testified pertained to Borda and the Palm Oil load and that are reflected in Borda H'rng Exh. 12. However, Oyervidez did not describe the Aracely deals as having been the same as the Palm Oil deal at issue in this case.[18] Furthermore, while Oyervidez' testimony in the *Mariano Alvarez* trial pertaining to the "Aracely" deals clearly references the same deals described as the "Aracely" deals in Borda H'rng Exh. 12, the figures and names mentioned by Oyervidez do not coincide at all with the figures and names mentioned in the "Aracely" deals described in Borda H'rng Exh. 12. Thus, at the very least, it stands to reason that H.B.'s testimony in this case would have been squarely impeached by Oyervidez' testimony in the *Mariano Alavarez* trial and that H.B. was not truthful in his testimony about the "Aracely" deals being the same as the "Palm Oil" deals. Oyervidez' testimony nor the "Aracely" exhibits that were used in the *Mariano Alvarez* trial (*Alvarez* government exhibits 25M-1 to 25M-11) were never produced to the defense in this case.

**B.      Borda H'rgn Exh. 13, 21 & 30**

The government's principal trial witness concerning the Palm Oil deal was Camilo

---

[17] The indictment in this case lists "Tony" as an alias for Borda.

[18] Defendants respectfully request the Court to take judicial notice Oyervidez' testimony in *United States v. Mariano Alvarez,* 07-CR-144 (SDTX). The relevant portions of Oyervidez' testimony, obtained through ECF, is attached herein as Exh. 1 to this Motion (July 15, 2009, at 22 – 39).

Suarez.  As stated, *supra*, Suarez' testimony that Junior had sent Palm Oil cocaine to New York completely sandbagged the defense because nothing that the government disclosed pre-trial indicated that any Palm Oil cocaine had reached the United States.  However, had the government produced Borda H'rng Exhs. 13 (HB factual proffer describing importation "on behalf of HB and Junior"); 21 (describing importation "unbeknownst" to Borda) and 30 (post-arrest recording of HB describing same), the defense would have been much better prepared to cross-examine and impeach Suarez on the crucial issue of knowledge and intent.  Because of the government's failure to produce this material prior to trial, the defense was extremely hampered in that it made strategic decisions, such as what witnesses to call, based on incomplete information.

### C.      Borda H'rgn Exh. 13, 21 & 30

The government's principal trial witness concerning the Palm Oil deal was Camilo Suarez.  As stated, *supra*, Suarez' testimony that Junior had sent Palm Oil cocaine to New York completely sandbagged the defense because nothing that the government disclosed pre-trial indicated that any Palm Oil cocaine had reached the United States.  However, had the government produced Borda H'rng Exh. 13 (HB factual proffer describing importation "on behalf of HB and Junior"); Exh. 21 (describing importation "unbeknownst" to Borda) and Exh. 30 (post- arrest recording of HB describing same), the defense could have cross-examined and impeached Suarez on the crucial issue of knowledge and intent.  This testimony was significant because it was the only evidence of an actual importation into the United States.  It went unchallenged because of the government's failure to produce this material prior to trial.  Indeed, in its response to one of Defendants' post-trial motions, the government pointed out that

> Suarez' testimony that Junior transported some or all of the
> cocaine to the United States was never contradicted. The jury was
> entitled to conclude that Suarez had knowledge of what happened
> to the palm oil load, and they were entitled to believe his
> testimony.

Gov Response to Def Reply re MJOA, Doc 222 at 5.  While the government failed to report to

the Court and the defense in that passage that the testimony was not contradicted because the

government had withheld material information that would have allowed the defense to contradict

it, the passage does support Defendants' argument that it was indeed prejudiced by the *Brady*

violation .  The defense was prejudiced in its strategic decisions, such as what witnesses to call,

and it was unable properly to confront this damning testimony.  *See, e.g., United States v.*

*Bagley,* 473 U.S. 667, 678 (1985) ("[t]he constitutional error . . . was the Government's failure to

assist the defense by disclosing information that might have been helpful in conducting the cross-

examination."); *Leka v. Portuondo,* 257 F.3d 89, 103 (2d Cir.2001) (*Brady* violations may

prejudice defense's ability to make tactical decisions).

### D.      Borda H'rng Exh. 38

Another glaring example of the government's contempt for its *Brady* obligations is

evidence by its withholding a letter from cooperator Eduardo Manjarres Pumarejo to NDDS

prosecutor Donnell Turner.[19]  Manjarres wrote a letter dated June 24, 2011, to Turner.  In that

letter, Manjarres discusses a conversation he had with another cooperator, Juan Montoya, where

Montoya tells Manjarres that the government would give Montoya an apartment and money if he

(Montoya) says that Borda wanted to kill him.  In effect, that he believed he would get specific

benefits if he testified a certain way.  Manjarres further states in the letter that Borda never said

he wanted to kill Montoya and that if Manjarres says that, it would be a lie.  (Borda H'rng Exh.

---

[19] NDDS prosecutor Donnell Turner is also the prosecutor in the United States v. Daum matter before this Court, where the Court found a *Brady* violation for failure to disclose witness statements.

38).

By failing to produce this letter until January 2012, the government violated *Brady* in two regards.  First, Montoya testified at trial about his being Borda's secretary in Mexico and about his involvement in the Palm Oil deal.  Regardless of when the Manjarres told the government that Montoya was not telling the truth or was prepared to testify a certain way to curry favor with the government, the government had an obligation to disclose the material as soon as it was aware of it.  Second, the government has given notice that it intended to elicit Manjarres' testimony at sentencing on the issue of Borda's alleged threats against Montoya.  At the very least, Manjares' letter was *Brady* as to Borda's sentencing and should have been disclosed long before it was.  In effect, the government withheld the letter from the defense for over 6 months and only disclosed it when Manjarres testified at the *Brady* hearings.

## IV.    REMEDY SHOULD BE DISMISSAL OR, AT A MINIMUM, A NEW TRIAL

The usual remedy for a *Brady* or *Giglio* violation is to set aside any affected convictions, *Kyles,* 514 U.S. at 435–36, and that generally contemplates an order for new trial.  *See, e.g., Giglio,* 405 U.S. at 155.  It is, however, within a district court's inherent power to dismiss an indictment on grounds of prosecutorial misconduct, which includes a pattern of *Brady* violations.  *See, e.g., United States v. Chapman*, 524 F.3d 1073 (9th Cir. 2008) (affirming dismissal based on findings that "the government recklessly violated its discovery obligations and made flagrant misrepresentations to the court" that it had complied with its discovery obligations); *Government of Virgin Islands v. Fahie*, 419 F.3d 249, 256 (3rd Cir. 2005) (noting power to dismiss). Although dismissal of an indictment for prosecutorial misconduct is an extreme sanction, it is a sanction within a court's discretion if sufficiently egregious prosecutorial misconduct has

occurred and has prejudiced the defendant.

In the instant case, as defendants have shown above, the Government's failure to produce exculpatory materials in a timely fashion prejudiced the Defendants and deprived them of their right to a fair trial.  Mr. Borda and Mr. Alvaran had a right to due process and a right to adequate assistance of counsel, both of which were impaired by the government's conduct.  By failing to disclose so much information material to Defendants' defense, the Government initially deprived them of these rights and their liberty for nearly four years.  They persisted in withholding this exculpatory evidence through the post-trial motions filed by the defendants without even the slightest hint that they were sitting on a raft of information that supported the Defendants' claims of innocence.  Had the government voluntarily come forward with this information within a reasonable time after trial, a new trial order may have been an appropriate remedy. The Government, however, perpetuated its unjust withholding of evidence and reckless failure to comply with its obligations through these proceedings.  At this point, the more appropriate remedy should be dismissal.  *See, e.g., Chapman*, 524 F.3d at 1073 (dismissal appropriate even where court did not find intentional violation but did find reckless disregard and misrepresentations to court that government had complied with its *Brady* obligations); *United States v. Lyons*, 352 F.Supp.2d 1231, 1250 -1252 (M.D.Fla. 2004) ("mixture of negligence, recklessness, and willfulness" on part of prosecutor merited dismissal for *Brady* violations); *United States v. Dollar*, 25 F. Supp. 2d 1320, 1322, 1332 (N.D. Ala. 1998) (dismissing indictment against all defendants after finding that the government "flagrantly, breached its unquestioned obligation to produce exculpatory and impeachment materials.").

## V.      CONCLUSION

Wherefore, for these reasons and any other reasons considered meritorious by the Court,

counsel would respectfully request that this Motion be granted and the indictment against Mr.

Borda and Mr. Alvaran be dismissed.  In the alternative, the Court should grant them a new trial

and require the government to compensate counsel during the retrial.

Dated:  Washington, DC.
       April 25, 2012                                    Respectfully submitted,

**BALAREZO LAW**

                                /s/
By: _____
A. Eduardo Balarezo
Bar No. 462659
400 Fifth Street, N.W.
Suite 300
Washington, D.C. 20001
(202) 639-0999 (tel)
(202) 639-0899 (fax)
filings@balarezolaw.com

*Counsel for Christian Borda*

**CARMEN D. HERNANDEZ**
P.O. Box 70
7166 Mink Hollow Road
Highland, MD 20777
(240) 472-3391 (tel)
(202) 628-2881 (fax)
Email: chernan7@aol.com

*Counsel for Alvaro Alvaran*

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that on this 30th day of April 2012, I caused a true and correct copy of the foregoing Defendants' Joint Post-Hearing Memorandum in Support of Motion to Dismiss for Brady Violations or, in the Alternative, for a New Trial to be delivered via Electronic Case Filing to the Parties in this case.

/s/

_____