UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, : | **FILED**<br>APR 2 2 2013<br>Clerk, U.S. District & Bankruptcy<br>Courts for the District of Columbia |
| Plaintiff, : | |
| v. : | Criminal Case No. 07-65 (GK) |
| CHRISTIAN FERNANDO BORDA,<br>et al., : | |
| Defendants. : | |

## MEMORANDUM OPINION

On December 9, 2010, Defendants Christian Fernando Borda ("Borda") and Alvaro Alvaran-Velez ("Alvaran") were convicted under the Controlled Substances Import and Export Act, 21 U.S.C. §§ 951 et seq., of conspiring to distribute five kilograms or more of cocaine with the intent or knowledge that the cocaine would be unlawfully imported into the United States. See Verdict Form as to Borda [Dkt. No. 207]; Verdict Form as to Alvaran [Dkt. No. 209]; 21 U.S.C. §§ 959, 960, 963.

Defendants moved for judgment of acquittal under Federal Rule of Criminal Procedure 29, which the Court denied in a Memorandum Opinion on March 9, 2011 [Dkt. No. 238]. Defendants next moved for a new trial under Federal Rule of Criminal Procedure 33, which the Court denied in a Memorandum Opinion on April 27, 2011 [Dkt. No. 249]. Defendants then moved to vacate

the jury verdict and to dismiss the indictment under the Fifth Amendment's Due Process Clause and Federal Rule of Criminal Procedure 6(e), which the Court denied in a Memorandum Opinion on November 27, 2012 [Dkt. No. 376].

This matter is now before the Court on Defendants' Joint Motion to Dismiss for Brady Violations[1] or, in the Alternative, for a New Trial [Dkt. No. 354]. Upon consideration of the Motion, the Opposition [Dkt. No. 360], the Reply [Dkt. No. 365], the Sur-Reply [Dkt. No. 366], the Sur-Sur-Reply [Dkt. No. 367], the entire record herein, and for the reasons set forth below, Defendants' Joint Motion to Dismiss is **denied**.

I. Background

Defendants were each convicted of conspiring, beginning in January 2005 and continuing to at least October of 2005, to distribute five or more kilograms of cocaine with the intent or knowledge that the cocaine would be unlawfully imported into the United States. See 21 U.S.C. §§ 959, 963. At trial, Defendants did not dispute that they had distributed cocaine during that period, but argued that they neither knew nor intended that the cocaine would be unlawfully imported into the United States.

---

[1] The remedy for a Brady violation is retrial, not dismissal. U.S. v. Pettiford, 627 F.3d 1223, 1228 (D.C. Cir. 2010) ("If we find a Brady violation, a new trial follows as the prescribed remedy, not as a matter of discretion.") (internal quotation marks omitted).

The Government offered evidence of three separate drug deals in 2005. The first deal, "Palm Oil One," took place between January and May 2005. In Palm Oil One, Defendants Borda and Alvaran arranged to ship 1,553 kilograms of cocaine concealed in drums of palm oil from Cartagena, Colombia to Puerto Progreso, Mexico. Upon the shipment's arrival in Puerto Progreso, an associate named Raul Valladeres, or "Junior," contacted Defendants to say that he could transport the cocaine to Monterrey, Mexico and would pay Borda $9,100 per kilogram within ten days after receipt of the drugs. Trial Transcript ("Tr.") at 18:24-20:18, 25:10-28:15 A.M. Session, Nov. 4, 2010. Defendants agreed to Junior's proposal, and Junior transported the cocaine north to Monterrey. Id.; Gov't Ex. 40b at 3-4.

The Government introduced evidence that Monterrey is located less than two hours away from the United States border. The Government's evidence showed that Monterrey is an inland city in Mexico with insufficient demand for a delivery of cocaine as large as the Palm Oil One load. See Gov't Ex. 40b at 6 (Defendant Alvaran stated that Monterrey is "not a market for personal use").

The Government also introduced the following evidence to prove that Defendants were aware that Junior was trying to sell the cocaine across the Mexican border into the United States.

First, on June 15, 2005, Defendant Alvaran met with the Government's confidential informant, Camilo Suarez ("Suarez"), after Junior had failed to pay Defendants for Palm Oil One within ten days of his receipt of the drugs. Suarez testified at trial that, in the course of that meeting, Alvaran expressed his understanding that the cocaine had been moved north of Mexico City to Monterrey. Tr. at 22:2-9 P.M. Session, Nov. 15, 2010; Gov't Ex. 34b.

Second, on July 20, 2005, Borda met with Alvaran and Suarez to discuss Junior's progress in making payments for Palm Oil One. Suarez defended Junior's delay to Borda by explaining that the "market went bad because the border got, [] harder for him." Gov't Ex. 40b at 3-7. Defendants then discussed the conditions at the border in further detail. Id. At one point, Borda noted that he understood Junior's difficulties because he had once been a drug dealer in the United States. Id. at 10. Borda also went on to explain that his source for cocaine in Colombia had told him how such transactions usually proceed:

> [Mexicans] get the merchandise, they say they'll take it, they pay us nine thousand in Monterrey and they go and sell it on the other side[2] for, for fourteen thousand or fifteen thousand pesos, and we're the ones that are losing because we lose time, money and everything else.

Id. at 22-23.

---

[2] "On the other side" refers to the United States.

- 4 -

Third, Suarez testified at trial that "[a]ll 1,553 [kilograms] went to the United States." Tr. at 44:5-9 A.M. Session, Nov. 18, 2010. Suarez also testified that he did not recall any discussion that Borda's 724 kilogram share of the Palm Oil One cocaine was going to Europe. Tr. at 46:13-17 P.M. Session, Nov. 18, 2010. And Suarez and Borda's secretary in Mexico City, Juan Montoya, testified at trial that payment was received from Junior for Palm Oil One in United States currency. Tr. at 45:17-24 A.M. Session, Nov. 17, 2010; Tr. at 71:9-18 A.M. Session, Nov. 24, 2010.

In the second deal, "Palm Oil Two," Defendants discussed shipping additional cocaine from Colombia to Mexico, but ultimately never did so because of their difficulties in receiving payment for Palm Oil One.

Finally, the third Palm Oil deal, named the "Chino Load," was scheduled for September 2005. In this third deal, Borda, Alvaran, and an associate named "El Chino" agreed to transport a second load of 3,000 kilograms of cocaine from Colombia to Mexico City, Mexico in two "go-fast boats," one of which was a Venezuelan-registered fishing vessel. However, the United States Coast Guard intercepted the fishing vessel, which was carrying half of the Chino Load, and the vessel's crew threw the cocaine into the Caribbean Sea. Tr. at 41:24-42:17 A.M. Session, Nov.

16, 2010. Consequently, the United States Coast Guard found no cocaine on the ship.

On the basis of this evidence, the Jury returned a verdict of guilty against Borda and Alvaran, concluding that each conspired to distribute more than five kilograms with the knowledge or intent that the cocaine would be unlawfully imported into the United States.

## II. Standard of Review

In Brady v. Maryland, 373 U.S. 83 (1963), the Supreme Court held that "the Due Process Clause imposes upon the prosecution an obligation to disclose 'evidence favorable to an accused . . . where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.'" U.S. v. Johnson, 519 F.3d 478, 488 (D.C. Cir. 2008) (quoting Brady, 373 U.S. at 87).

A "true Brady violation" has three components: "[1] The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; [2] that evidence must have been suppressed by the State, either willfully or inadvertently; and [3] prejudice must have ensued." Strickler v. Greene, 527 U.S. 263, 281-82 (1999); United States v. Pettiford, 627 F.3d 1223, 1227 (D.C. Cir. 2010).

To satisfy the prejudice component, the withheld evidence must be "material;" that is, there must be "a reasonable

probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Strickler at 280 (quoting U.S. v. Bagley, 473 U.S. 667, 676 (1985)); see United States v. Cellis, 608 F.3d 818, 837 (D.C. Cir. 2010). In other words, the defendant bears the burden of showing a reasonable probability of a different result. Strickler, 527 U.S. at 291; U.S. v. Gale, 314 F.3d 1, 4 (D.C. Cir. 2003).

In determining whether the defendant has met that burden, courts have a "responsibility to evaluate the impact of the undisclosed evidence not in isolation, but in light of the rest of the trial record," U.S. v. Pettiford, 627 F.3d 1223, 1229 (D.C. Cir. 2010), and "must consider the non-disclosure dynamically, taking into account the range of predictable impacts on trial strategy." Johnson, 519 F.3d 478, 488 (internal quotation marks omitted).

**III. Analysis**

The Defendants were indicted in this case on March 16, 2007. On December 9, 2010, they were convicted of conspiring to distribute five kilograms or more of cocaine with the intent or knowledge that the cocaine would be unlawfully imported into the United States. Between the date of their indictment and the date upon which their trial began on November 1, 2010, there was extensive pretrial activity.

Defendants filed numerous pretrial motions, many of which alleged discovery difficulties and Brady violations. Defendants prevailed on some of the motions and failed on others.

In addition to the rulings on those motions, the Court held numerous Status Conferences with counsel, most of which focused on the difficulties that Defendants were having getting appropriate discovery from the Government. Although the Government did, in fact, properly turn over a great deal of discovery, the bottom line is that whether purposefully, negligently, or innocently, it was less than forthcoming in fully satisfying its discovery obligations, thereby, making the efforts of defense counsel to prepare for a long and difficult trial far more onerous than necessary.

In sum, while the Government did turn over many thousands of pages of discovery and many tape recorded conversations, it did so reluctantly and oftentimes belatedly, thereby affecting the ability of defense counsel to make full use of the documents before they began their last-minute push for trial.

At trial, much of the evidence presented by the Government consisted of recordings of telephone or in-person conversations, taped by cooperating witnesses. The evidence presented was difficult for the jury to follow. Virtually all the telephone calls were in Spanish, and the jury was required to follow them by reading written translations provided by the parties. The

trial was relatively long and required close attention from the jury because of the extensive use of these recorded conversations. Finally, most of the Government witnesses were cooperators who had their own histories of lengthy involvement in the drug trade and convictions for drug offenses, so that determining credibility had to have been a challenging task for the jury.

While this Court has already acknowledged that the Government's evidence was not "overwhelming," that, of course, was not the Government's burden to satisfy. The jury well understood that the Government's burden was to prove its case beyond a reasonable doubt.

Above all, this was quintessentially a "jury case" in that the Government's case rested overwhelmingly on the jury's evaluation of the credibility of the major witness-cooperators, and on the inferences to be drawn from the taped telephone conversations, of which they heard many. The jury did its job and reached its conclusion--which was, as noted earlier, for conviction.

Defendants have identified numerous documents and statements which they argue were favorable to them, were not given to them by the Government and which contained material information whose absence or late production prejudiced their case. The Court must now evaluate the impact of those alleged

Brady violations in light of the trial record as a whole and determine whether they were favorable to the Defendants, whether that evidence was suppressed by the Government, and whether "prejudice must have ensued" such that there was a "reasonable probability" of a different result.

1. After the trial was completed and a verdict was reached, Defendants alleged that the Government had withheld evidence that they did not know or intend for the Palm Oil cocaine to be sent to the United States. This allegation was based on a written statement given to one of Borda's attorneys by Raphael Mejia, who had been incarcerated with co-conspirator H.B. and Borda at Northern Neck Regional Jail in Warsaw, Virginia.[3] Mejia claimed that while incarcerated together, H.B. told him that Borda "made it very clear to him (H.B.) and [Junior] that he (Borda) did not want any cocaine sent to the United States." Mejia also claimed in that statement that H.B. also told Government agents that Borda did not want cocaine sent to the United States.

Mejia, whose hearsay testimony would not have been admissible at trial, gave inconsistent testimony during the

---

[3] Mejia had no other connection to this case.

post-trial evidentiary hearing[4] about whether H.B. had or had not told him that Borda knew that the cocaine was sent to the United States. Moreover, his testimony was impeached by the Government with his written statement.

Importantly, at the post-trial hearing, H.B. himself testified that he never told Mejia or Government agents that he thought Borda did not know or intend to send the Palm Oil load to the United States.

At the post-trial hearing, the Government called two Special Agents, Michael Chase and Michael Chavarria, and a DEA Intelligence Analyst, Patricia Skidmore,[5] all of whom testified that H.B. never told them that Borda did not know or intend that the Palm Oil load would go to the United States. In short, the testimony of Chase, Chavarria and Skidmore was consistent with H.B.'s testimony, and directly contradicted the testimony of Mejia.

---

[4] The post-trial evidentiary hearing on the alleged Brady violations was held on December 12 and 13, 2011, January 23-24, 2012, and February 10, 2012.

[5] Defendants also argue that a draft report of an interview with Junior prepared by Skidmore constitutes Brady material withheld by the Government. That draft report notes that, "[u]nbeknownst to Borda, the CS and [H.B.] took an additional 100 kilograms of cocaine believing they could sell it in Houston for a larger profit ($13,500/kilogram)." In addition to the report being inadmissible, Skidmore testified that Junior never told her that Borda did not know the Palm Oil load was going to the United States. Skidmore's testimony directly contradicts Defendants' interpretation of the draft report she wrote.

For the reasons stated above, Defendants have failed to show that prior to trial the Government suppressed, or even possessed, any favorable information regarding H.B.'s alleged statements to Mejia. Moreover, even assuming the information had been favorable, and assuming further that the Government had it and failed to disclose it to Defendants, the Court concludes that there is no reasonable probability that Mejia's testimony before the jury would have produced a different result, given all the evidence the Government did submit regarding Borda's knowledge and intent about distribution of the Palm Oil load to the United States.[6]

2. Defendants argue that the Government failed to provide any evidence clearly demonstrating that the Palm Oil load had ever actually gone to the United States. Basically, the Defendants are arguing that the Government should have been required to prove a negative. However, the allegation is not even factually correct. As noted earlier, Suarez testified that "[a]ll 1,553 [kilograms] went to the United States." In addition, there was one DEA report prepared by Agent Chase dated

---

[6] While the Court finds no Brady violation, it does find that the Government's charge that "Mejia's attorney, Heather Shaner, influenced his testimony" is out-and-out outrageous. See Gov't's Opp'n to Defs.' Mot. To Dismiss, 21, 24. Ms. Shaner is a long-time, respected CJA lawyer who has handled numerous criminal cases. To state that she "influenced" her client's testimony is to accuse her of having violated all ethical rules that govern her professional conduct and her Oath of Admission to this Court.

January 20, 2006, which was disclosed to Defendants at the time of the post-conviction hearings. That report stated that Junior told Agent Chase that Borda believed the cocaine went to the United States. Such a report would have been inadmissible since it was pure hearsay. Moreover, it certainly would not have been favorable to the Defendants. Thus, it could not have been Brady material.

Defendants also seem to be arguing that the Government violated Brady by not disclosing the many DEA reports which said nothing at all about whether the Palm Oil load reached the United States, or about Borda's and Alvaran's knowledge and intent with respect to the destination of the Palm Oil load.

The fact that Government statements or exhibits are silent and do not implicate a defendant certainly cannot be construed as "favorable" to that defendant. In short, the absence of incriminating information in a report cannot be turned into an affirmative conclusion that it is "favorable" to the Defendants and, therefore, cannot constitute Brady material.

3. Defendants allege that Brady was violated because the following pieces of "favorable" information were not disclosed prior to trial: (1) a summary of an interview with Junior in which it is claimed that Junior told the Agents that Colombians were actually engaged in trafficking to Europe, and (2) a report establishing that H.B. told the Government that Bruno was

secreting cocaine inside ovens, which he then sent to Europe. Defendants also complain about a disclosure before trial by Geraldo Cantu which referred to a 2000 kilogram shipment of cocaine from Mexico to Spain.

Apart from the fact that much of this information was in fact disclosed to Defendants, it was not material. Once again, Defendants are arguing that the absence of information constitutes "favorable" material under Brady. That is simply not the case. Putting on affirmative evidence that Defendants were shipping cocaine to Europe would not have helped prove that they did not intend or know that the Palm Oil load was going to the United States.

Moreover, the Court has already concluded that "evidence pertaining to Defendant Borda's involvement in selling drugs to other countries outside of the United States is not Brady evidence." Order (October 21, 2010) [Dkt. No. 140].

4. Defendants argue that the Government violated Brady by failing to produce the factual proffer which supported the guilty plea that H.B. entered in the U.S. District Court for the Southern District of Texas ("SDTX").

H.B.'s plea agreement along with its factual basis cannot be deemed Brady material because the Government did not suppress it. In 2009, the plea agreement was filed as a public record, was listed on the public ECF docket within two days of its

actual filing, and has been publicly available ever since. The Government is correct that there cannot be a <u>Brady</u> violation for failure to disclose public documents which the Defendants could have found on their own. While defense counsel did have a vast amount of material to examine prior to trial, it certainly would not have been impossible for these technologically savvy lawyers and paralegals to have located this information, which was accessible to them.

Defendants argue that because H.B.'s plea agreement did not explicitly mention that Borda knew or intended the Palm Oil load to go to the United States, the proffer, in conjunction with other testimony, "would have been powerful evidence in support of Defendants' theory." Once again, Defendants are asking that the mere absence of incriminating evidence is "favorable" under <u>Brady</u>. That is just not correct, as the Court has already ruled, <u>supra</u>.

5. Defendants complain that the Government did not give them rough handwritten notes which Agent Chase took of an interview with Cantu on October 15, 2010. Neither Cantu nor Chase testified at trial. Included in the notes was the following sentence:

> The Colombian (Borda) thought he had done the best thing by reaching Mex. & didn't want to risk sending to U.S. <u>Borda was happy w/Mex. prices & didn't want to risk sending up to N.Y. but wants Cantu to convince Tony that everything would be O.K. if Drug were seized in U.S. Tony would lose most</u>

- 15 -

<u>b/c he was owner</u>. Jr. said Tony already knows about you (Cantu) b/c Jr. and Camilo had spoke highly of you. [sic.] (emphasis added)

Since Chase's notes contained Cantu's statements, those notes would clearly have been deemed hearsay. Additionally, since Cantu did not testify at trial, whatever statements he may have made to Agent Chase back in 2010 could not have been used by Defendants to impeach him if he had testified.

Moreover, those notes were not clearly "favorable" to Borda; indeed, they indicate that while Borda did not want to risk sending the drugs to New York, he certainly knew there was a possibility that New York would be their destination.

Finally, the information itself was brought out in trial during the testimony of Camilo Suarez, the Government's main witness-cooperator. As this Court already noted "a reasonable jury could have inferred from this evidence that Defendants did not want to be personally responsible for transporting the cocaine into the United States, but nevertheless concluded on the basis of other information that Defendant knew that the cocaine would eventually reach that market through Junior." Memorandum Opinion (March 9, 2011) at 9-10 [Dkt. No. 238].

For all these reasons, Agent Chase's rough notes of his interview with Cantu did not constitute <u>Brady</u> material.

6. Defendants argue that the Government violated <u>Brady</u> by failing to disclose a recorded post-arrest interview of H.B. in

which Defendants claim that H.B. stated that all of the cocaine was sold in Monterrey and that 100 kilograms belonging to H.B. and Junior were shipped to New York. The post-arrest interview contained no favorable information. While the interview did not address Defendants' knowledge or intent, it fully implicated the Defendants in the Palm Oil load and was consistent with the Government's trial evidence. Thus the post-arrest interview does not constitute Brady material.

Defendants also argue that the Government violated Brady by failing to turn over certain trial exhibits related to the testimony of Reynaldo Oyervides during a 2009 trial in the SDTX.[7] Defendants contend that these documents, identified as "Aracely I" and "Aracely II," constitute favorable material withheld by the Government.[8]

---

[7] In 2009, Reynaldo Oyervides testified as a Government witness in a narcotics trial in the SDTX. Oyervides had worked for Junior as a bookkeeper, responsible for maintaining Junior's drug records. Oyervides had saved some records in summarized form, and several of those summaries were introduced at the trial in Texas. Two of the summarized records were identified in that trial as "Aracely I" and "Aracely II."

[8] More specifically, Defendants note that, at trial, Suarez testified that the Palm Oil load consisted of one shipment of approximately 1,500 kilograms of cocaine. Defendants further note that at the post-trial Brady hearing, H.B. testified that the Aracely documents are account sheets pertaining to the Palm Oil load. According to Defendants the Aracely documents indicate that the Palm Oil load consisted of two separate loads of cocaine, one 1,000 kilogram load and one 1,089 kilogram load, for a total of 2,089 kilograms of cocaine. Defendants contend

H.B. did not disclose information regarding the Aracely documents to the prosecutors in this case until several days before the January 2012 post-trial Brady hearing. Although the documents were known to prosecutors in the SDTX in 2009, there is nothing on the face of the documents which indicate any connection of them to the Palm Oil load. Moreover, Oyervides' testimony during the 2009 trial did not link Aracely to the Palm oil load. There can be no Brady violation where, as here, the Government could not have known, and did not know until approximately one year after trial, that documents in the possession of prosecutors in Texas might be linked to the Palm Oil load.

Moreover, even assuming that the Government possessed and suppressed the Aracely documents, there is no reasonable probability that, had Defendants been able to use them to impeach Suarez's testimony about the composition of the Palm Oil load, the result of the proceeding would have been different.

8. Defendants additionally argue that the Government violated Brady by failing to turn over: (1) a DEA report noting that Junior told the DEA that H.B. was involved in the murder of another trafficker and (2) a June 2011 letter from Luis Manjarres which the Defendants claim shows that Juan Montoya, a

---

that they could have used these documents to impeach Suarez's trial testimony.

government witness, asked Manjarres to lie about Borda threatening Montoya. The DEA report is not Brady material because it is inadmissible hearsay, and the June 2011 letter from Manjarres is not Brady material because it did not even exist at the time of trial.

## IV. CONCLUSION

Considering Defendants' claims cumulatively, the Court concludes that Defendants have failed to meet the very demanding Brady standard. Because each of the alleged Brady materials identified by Defendants was either inadmissible, not favorable, not suppressed by the Government, or did not exist at the time of trial, there is no reasonable probability that there would have been a different result had the Government disclosed them.

For the reasons set forth above, Defendants' Joint Motion to Dismiss for Brady Violations or, in the Alternative, for a New Trial is **denied**. An Order will accompany this Memorandum Opinion.

April 22, 2013

*Gladys Kessler*
Gladys Kessler
United States District Judge

**Copies to:** Attorneys of Record via ECF